Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| H.R., and D.R., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, the CORNING INCORPORATED BENEFITS COMMITTEE, and the CORNING MEDICAL WELFARE-HEALTH PLAN. <br><br> Defendants. | PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT <br><br> Civil No. 2:21-cv-00386-RJS-DBP <br><br> Chief Judge Robert J. Shelby Chief Magistrate Judge Dustin B. Pead |

Plaintiffs H.R. and D.R., move this court for summary judgment against Defendants

United Healthcare Insurance Company, United Behavioral Health (collectively "United") the

Corning Incorporated Benefits Committee ("Corning"), and the Corning Medical Welfare-Health

Plan ("the Plan"). This motion includes Plaintiffs' first cause of action asserted under the

Employee Retirement Income and Security Act of 1974 ("ERISA"), Plaintiffs' second cause of

action asserted under the Mental Health Parity and Addiction Equity Act ("MHPAEA"), and Plaintiffs' third cause of action (the "statutory penalties" cause of action) asserted under 29 U.S.C. § 1033.

Defendants produced a prelitigation appeal record ("Record) to the Plaintiffs which has been Bates stamped as UNITED 000001 through UNITED 010700. This record contains some documents that were produced through discovery. The Record has been or will be provided to the Court and Plaintiffs will refer to the Record as Rec. 1 through Rec. 10700.

## **INTRODUCTION**

After many years of outpatient services failed to help D.R. resolve his behavioral dysregulation at school and at home, H.R. followed professional clinician recommendations and sought treatment at higher levels of care. H.R. sought these more intensive levels of care only after D.R.'s behaviors became threatening to himself and D.R.'s mother as well as resulting in suspensions from school.

Unable to adequately protect themselves and provide a sufficiently safe and structured environment for D.R., H.R. first obtained therapeutic intervention at Second Nature, an outdoor behavioral health provider. A psychological evaluation conducted while at Second Nature recommended further treatment in a residential setting once D.R. had completed that program. H.R. followed that professional advice as well and D.R. received additional treatment at Maple Lake Academy, a residential treatment center.

When H.R. submitted claims for coverage for D.R.'s treatment at Second Nature and Maple Lake, United denied those claims. The reasons that United gave for denying the coverage shifted and violated the terms of the Plan and therefore United should be ordered to pay for D.R.'s treatment. United also violated MHPAEA by imposing more restrictive conditions on

D.R.'s mental health benefits than United would for analogous medical/surgical claims. For these violations, Plaintiffs are entitled to equitable relief to make them whole.

Finally, H.R. requested documents under which the Plan was operated from Corning, the Plan administrator, and United, acting as the agent for Corning. Corning failed to respond to these requests in a timely manner and is therefore subject to statutory penalties.

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

### Parties, Jurisdiction And Venue

1. H.R. and D.R. reside in Texas. [Rec. 0659, 688].

2. H.R. is D.R.'s father. [Rec. 0659, 674, 688].

3. United is an insurance company and was the claims administrator, during the treatment at issue in this case. [ECF 25, ¶2].

4. United Behavioral Health ("UBH") was the designated behavioral health claims administrator under the Plan. [*Id.*].

5. The Corning Incorporated Benefits Committee ("the Committee") is the Plan Administrator. [ECF 25, "Answer" ¶ 3].

6. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). [*Id.* at ¶4].

7. H.R. was a participant in the Plan and D.R. was a beneficiary of the Plan at all relevant times. [ECF 25, ¶ 4].

8. H.R. and D.R. continue to be participants and beneficiaries of the Plan. [ECF 25, ¶ 4].

9. D.R. received medical care and treatment at Second Nature Blue Ridge ("Second Nature") from May 26, 2017, to August 16, 2017. [Rec. 0570, 659, 674].

10. Second Nature is located in Georgia. [ECF 25, ¶5].

11. D.R. received medical care and treatment at Maple Lake Academy ("Maple Lake") from August 18, 2017, to October 4, 2018, [ECF 25, ¶ 32; Rec. 5346, 5594].

12. Maple Lake is located in Utah [ECF 25, ¶ 5].

13. Second Nature and Maple Lake are licensed treatment facilities which provide sub-acute inpatient therapeutic treatment to adolescents with mental health, behavioral, and/or substance abuse problems. [Rec. 732-733; 3511; *See also* 734-769; Rec. 5541-5542; 5543-5548].

14. Residential treatment facilities in Utah are required to provide adolescents with a curriculum to continue their education. [Rec. 5548].

15. United, acting in its own capacity or under the brand name Optum, denied claims for payment of D.R.'s medical expenses in connection with his treatment at Second Nature and Maple Lake. [Rec. 658-669; 3491-3500].

**Relevant Plan Terms**

16. The Plan incorporates MHPAEA's requirements as part of its benefit guarantees.

> The Mental Health Parity and Addiction Equity Act requires group health plans like the Corning medical plan to ensure that the financial requirements (such as copayments and deductibles) and treatment limitations (such as visit limits) for mental health or substance abuse disorders are generally equivalent to all other medical/surgical benefits. [Rec. 56].

17. The Plan provides coverage for mental health care.

> Corning provides Behavioral Health benefits through United Behavioral Health. This program is designed to provide flexible and consistent mental health and substance abuse benefits. United Behavioral Health specializes in behavioral health care and offers the most appropriate, up-to-date clinical practices and treatments.
> The Mental Health Parity and Addiction Equity Act requires group health plans like the Corning medical plan to ensure that the financial requirements (such as copayments and deductibles) and treatment limitations (such as visit limits) for mental health or substance abuse disorders are generally equivalent to all other medical/surgical benefits.  [Rec. 0056].

18. The Plan defines Medical Necessity, in part, as health care services provided for preventing or treating a sickness or mental illness, or symptoms that meet the following requirements:

- In accordance with Generally Accepted Standards of Medical Practice.
- Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for your sickness, injury, mental illness, substance- related and addictive disorder, disease or its symptoms.
- Not mainly for your convenience of that of your doctor or other health care provider.
- Not more costly than an alternative drug, service(s) or supply that is a least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your sickness, injury, disease or symptoms.

[Rec. 41, 7244]

19. The Plan provides the following procedure when making decisions on appeal:

After an appeal is filed, the Plan Administrator will respond to the claimant within a certain period of time. The amount of time that the Plan Administrator has to respond is based on the claimant's underlying claim for benefits as set forth below:
- Post-Service Claims: 30 days after receiving claimant's appeal request…
- If the claim on appeal is denied in whole or in part, the claimant will receive a written notification of the denial. The notice will be written in a manner calculated to be understood by the claimant and will include:
- The specific reason(s) for the denial.
- References to the specific Plan provisions on which the benefit determination was based;
- A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies, of all documents, records, and other information relevant to the claimant's claim for benefits;
- A description of the Plan's review procedures and applicable time limits;
- A statement that the claimant has the right to obtain, upon request and free of charge, a copy of internal rules or guidelines relied upon in making this determination, and if the adverse determination is based on medical necessity or experimental treatment or a similar exclusion or limit, either an explanation of the scientific or clinical judgment, applying the terms of the Plan to the claimant's medical circumstances, or a statement that this will be provided free of charge upon request.

[Rec. 1367].

## BACKGROUND FACTS

### D.R.'s Developmental History and Medical Background

20. D.R.'s birthmother abused substances while she was pregnant with him. [Rec. 5359].

21. He was later adopted by H.R. [Rec. 0554].

22. When D.R. was seven years old, he was been sexually abused by a babysitter, he then began seeing a therapist, Ted Asay, Ph.D. D.R. struggled in school and became increasingly angry and defiant. [Rec. 7384; 7386].

23. He often stole from others and then lied about it when confronted. [Rec. 7384; 7386].

24. D.R. became increasingly violent and physically aggressive, and on one occasion caused his brother to require surgery after slamming the door shut on his hand. [Rec. 7385].

25. D.R. was suspended from school on multiple occasions, including one instance where he punched another child because, "he was annoying me." [Rec. 7385].

26. By April of 2017, Dr. Asay recommended that D.R. treated in an intermediate residential program. [Rec. 7385].

27. D.R. began seeing a new therapist, Sylvie-Queen Ekobena, LPC who also recommended that D.R. be enrolled in an inpatient treatment program. [*Id.*].

28. D.R. became more and more physically abusive and threatened his family; he threw things in fits of rage, kept a kitchen knife in his dresser drawer, and shoved his mother to the ground on multiple occasions. [Rec. 7386].

### Second Nature

29. D.R. was admitted to Second Nature on May 26, 2017, for the safety of himself and his family. [Rec. 659].

30. Second Nature is a "licensed adolescent treatment program" that provided daily group therapy. [Rec. 7998].

31. Anne Wilzbacher, LPC, was D.R.'s treating clinician. [Rec. 7998].

32. D.R. participated in the group therapy and he received weekly individual psychotherapy and family intervention as well as therapeutic assignments that were monitored by Ms. Wilzbacher and residential staff." [Rec. 7998].

33. D.R. had a treatment plan and Ms. Wilzbacher monitored D.R.'s treatment progress. [Rec. 7998-8073].

34. While at Second Nature, D.R. was diagnosed with autism spectrum disorder, oppositional defiant disorder, major depressive disorder, attention-deficit hyperactivity disorder, executive functioning deficits, and a parent-child relational problem. [Rec. 8073].

35. At discharge, Ms. Wilzbacher summarized the areas of progress and struggle that D.R. experienced while at Second Nature. [Rec. 7999-8000].

36. At discharge, D.R. was at risk of relapsing if he were to return home, and the program recommend that D.R. go directly to his next program as even a short stay at home could lead to relapse. [Rec. 8000].

37. In a letter dated November 17, 2017, United denied payment for D.R.'s treatment. The letter stated in part: [Rec. 0659]

> Your child was admitted for intensive treatment of her [sic] emotional dysregulation around 05/26/2017 at Blue Ridge Therapeutic Wilderness. Optum has determined its wilderness therapy program to be an experimental or unproven treatment. It is not covered under his health plan benefit. He could have received treatment for his condition for his condition with Intensive Outpatient services. A care advocate is available to assist you with referrals if you should desire them.

38. On May 11, 2018, H.R. submitted a level one appeal of the denial of D.R.'s treatment at Second Nature. [Rec. 674-683].

39.  H.R. disputed United's contention that D.R.'s treatment was experimental or investigational and stated that the language of the insurance policy did not support this claim. [Rec. 0674; 0677; cf. 0732-0733].

40. He reminded United of its obligations under ERISA including its responsibility to use appropriately qualified reviewers and disclose their credentials, to reference the specific plan provisions on which the denial was based, and to conduct a valid and thorough review of the denial. H.R. stated that the previous denial had not even been "thorough enough to correctly state our son's gender." [Rec. 0675-0676].

41. H.R. stated that the Plan was subject to MHPAEA which prohibited it from imposing stricter requirements on mental health care than it applied to comparable medical or surgical services. H.R. identified skilled nursing and rehabilitation services as some of the medical or surgical analogues to the treatment D.R. received. [Rec. 0676].

42. H.R. referenced the Final Rules for MHPAEA and argued that by excluding coverage for Second Nature, an intermediate level mental health treatment facility, which was a licensed facility which offered treatment in accordance with the laws of the State of Georgia where it was located, but not excluding coverage for intermediate level medical or surgical care in the same manner, United was in violation of MHPAEA. In the event United disagreed with his conclusion that it violated MHPAEA, H.R. requested a "thorough explanation" as to how United's denial was in compliance with MHPAEA and the terms of the insurance contract. [Rec. 0677; 7404-7405].

43. He argued that outdoor behavioral health treatment was an effective and clinically proven treatment modality and included a study and academic articles to that effect. He pointed out that D.R.'s treatment had been effective at treating his mental health conditions and

argued that without the treatment he had received, D.R. would not have made such progress. [Rec. 7405-7410].

44. H.R. asked in the event that United maintained the denial that it provide him with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, the Plan's mental health and substance abuse criteria, the Plan's criteria for skilled nursing and rehabilitation facilities, any reports or opinions from any physician or other professional regarding the claim, specific references to provisions from their plan that were used in making determinations, as well as the names, qualifications, and healthcare claim denial rates of all individuals who reviewed their claim (collectively the "Plan Documents"). H.R. stated that he was entitled to these materials because they constituted documents under which the Plan was operated. [Rec. 7410].

45. In a letter dated October 12, 2018, United upheld the denial of payment for D.R.'s treatment. [Rec. 1207-1208].

46. The letter stated in part: [1207-1208]

Taking into consideration the available information, including the additional clinical information provided in the Letter of Appeal and Medical Record and also the locally available clinical services, the requested service did not meet the Optum Level of Care Guideline required to be followed in the member's behavioral health plan benefits. Specifically: The member's clinical condition appeared to be stabilized to the extent that he did not require a facility based program which delivers 24-hour7-day assessment and diagnostic services, and active behavioral health treatment to prevent harm to himself or others. He did not need frequent assessment and diagnosis and/or treatment planning, with 24/7 monitoring. He had consistently denied suicidal or homicidal thoughts. He was not self-harming or aggressive towards others. He was not an imminent danger of harm to self or others. The member was cooperative, responsive to staff, medication adherent, and doing better. He had no reported behavioral problems and was cooperative with care. He was participating in all aspects of his treatment. He was medically stable, with adequate sleep, appetite, and self-care. He did not have any medication changers

[sic] and was not experiencing side effects or showing acute impairment to behavior or cognition. He continued to baseline impulsivity and reactivity related to his diagnoses of ADHD and ODD, and he was also newly assessed as having ASD with social impairments. The member had not been using illicit substances and had no symptoms of withdrawal or cravings. There were no clinical barriers preventing the member from transitioning to a less intensive level of care.

Care could have continued in the Mental Health Intensive Outpatient Program setting.

Additionally, the letter of appeal from the member's parents includes the facility's operations license. The facility is licensed as an outdoor therapeutic camp. The description of the nature of the business is sponsoring and therapeutic and behavioral counseling services and programs. [sic] The facility does not appear to be licensed as a mental health residential treatment center. The method of providing primary services is via a nomadic wilderness therapy program. A child admitted to this type of licensed program is legally described as a "camper" or "resident" as opposed to "a patient." This indicates the enrollee is not in a clinical status. From the facility website, the member was entered into a Wilderness Therapy Program…
The program does not appear to meet the common clinical best practices or provide level of intensity of programming expected in a mental health residential treatment center (RTC).

47. On March 26, 2019, H.R. submitted a level two appeal of the denial of payment for

    D.R.'s treatment. [Rec. 1906].

48. H.R. objected to what he described as United "shift[ing] their denial reason" for why

    payment was denied. [Rec. 1907].

49. H.R. wrote that he confirmed United received his appeal on May 12, 2018; however, he

    did not receive a timely response within the timeframe outlined by ERISA. He stated that

    he did not receive the October 12, 2018, denial mentioned above until February 15, 2019.

    H.R. pointed out that the letter from United was postmarked February 5, 2019 and argued

    that this violated United's obligations under ERISA to carry out a full and fair review

    process. [Rec. 1908-1909].

50. H.R. stated that Blue Ridge was a licensed outdoor behavioral health facility – a type of

    program similar to residential treatment care, but distinct in many aspects including

billing codes – and he alleged that United was restricting the availability of D.R.'s mental health treatment in a manner that it did not apply to medical or surgical treatment, in violation of MHPAEA. [Rec. 1909-1910].

51. H.R. wrote that United appeared to be denying D.R.'s mental health treatment in large part because it took place outdoors, but it had no similar restriction for medical or surgical care. [Rec. 7382]

52. He stated that United had erroneously claimed that "wilderness" programs did not use a multidisciplinary team of treatment providers, nor were they accredited by agencies such as The Joint Commission. H.R. wrote that United's argument was false and that these facilities were often accredited, and they did utilize appropriately qualified staff. H.R. accused United of using criteria which was outdated and flawed to evaluate D.R.'s treatment. [Rec. 7382].

53. H.R. contended that D.R.'s treatment was a covered benefit under the terms of the insurance policy. He noted that United made payment of benefits for intermediate level mental health treatment contingent on factors such as "imminent or current risk of harm to self, others, and/or property" or "acute impairment of behavior or cognition…" H.R. contended that these acute level criteria were not appropriate factors to evaluate the subacute mental health care D.R. received. H.R. pointed out that United did not impose acute level requirements for skilled nursing or inpatient rehabilitation to be approved. [Rec. 7383-7384].

54. H.R. stated that D.R.'s care at Second Nature was recommended by his treatment team. He included letters of medical necessity with the appeal. In a letter dated May 29, 2018, Ted Asay, Ph.D. in Clinical Psychology, wrote in part: [Rec. 7387]

…I discussed with [D.R.]'s mother the option to have him switch to another therapist who was closer to their residence so he could have more frequent therapy sessions. I supported that plan and recommended further that if he continued to have significant behavioral problems after being in more intensive outpatient treatment for a reasonable period of time, they should consider placement in a more structured, intensive treatment environment, such as a residential treatment program. …

Sylvie-Queen Ekobena, LPC, wrote in a letter dated May 9, 2018: [Rec. 7388]

[D.R.] was diagnosed with oppositional defiant disorder, generalized anxiety disorder and post traumatic stress disorder. I attempted to work with [D.R.] through his issues with very little progress. There were times in session when he would be blatantly rude to his mother and state that he does not care what happens to him as far as his future. His oppositional and defiant behaviors continued and I recommended his family place him in an inpatient program for troubled teenagers. Progress was not being made with an [sic] outpatient treatment and he was quickly declining. I believe it was in his best interest to be in the inpatient program as his mother stated he was making progress while there.

Kera Pavelka, MBA, one of D.R.'s special education instructors wrote in a letter dated

May 8, 2018: [Rec. 7389]

…My team and I recommended to his parents that [D.R.] would benefit from being enrolled in a different environment to address all of the above behaviors at that time. To help [D.R.] focus on academic and social goals, we placed [D.R.] into a more restrictive learning environment. This helped him in the short term with some of his behaviors.
[D.R] would most certainly benefit from care in an environment that retrains behaviors and stimulates his ability to learn and be successful in society.

55. H.R. stated that it was the opinion of the medical professionals that had treated D.R. that he needed the level of care he received, especially given the sexual assault he suffered at a very young age, the difficulty involved in keeping himself and others safe, and the failure of other levels of care to properly treat his conditions. [*Id.*]

56. H.R. requested that United respond to each of his concerns individually. He asked that United perform "a full parity analysis of our plan and all governing documents, such as clinical criteria and guidelines." H.R. again requested a copy of the Plan Documents. [Rec. 7390].

57. In a letter dated June 3, 2019, United upheld the denial of payment. The reviewer gave

the following justification for the denial:

> Your child was admitted to the Second Nature Blue Ridge facility, which submitted
> claims for treatment at the mental health residential level of care. After reviewing the
> medical records, the programming described did not adhere to the Optum clinical best
> practices for treatment in a mental health residential setting. Namely, there was no
> initial nor ongoing assessment by a psychiatrist during your son's treatment episode.
> This does not mean that he could not have received treatment. Instead, he could have
> received care in a mental health residential treatment setting that met the Optum
> guidelines for mental health residential treatment.
> Based on our Level of Care Guideline for Mental Health Residential Rehabilitation
> Level of Care, it is my determination that no authorization can be provided from:
> 05/26/2017 and forward.

[Rec. 0576-0577].

### Maple Lake

58. D.R. was admitted to Maple Lake on August 18, 2017. [ECF #25, ¶ 32]

59. In a series of explanation of benefits ("EOB") statements, United denied payment for

D.R.'s treatment under code S8:

> YOUR PLAN PROVIDES BENEFITS FOR SERVICES THAT ARE
> DETERMINED TO BE COVERED HEALTH SERVICES. THE INFORMATION
> RECEIVED DOES NOT SUPPORT MEASURABLE PROGRESS TOWARDS
> DEFINED TREATMENT GOALS FOR THESE SERVICES. THEREFORE,
> ADDITIONAL BENEFITS ARE NOT AVAILABLE. (emphasis in original)

[Rec. 7260].

60. On August 17, 2018, H.R. submitted a level one appeal of the denial of D.R.'s treatment.

He asked United to take into account all of the information he provided and to comply

with its responsibility under ERISA to provide him with a full, fair, and thorough review.

[Rec. 2018-2020].

61. H.R. wrote that he contacted United on multiple occasions in order to request information

on the "scientific basis and clinical judgment" United relied on to deny care. He argued

that United either refused to do so or pointed him to its website which contained a

laundry list of guidelines with no indication of which of these, if any, applied to D.R.'s

treatment. H.R. asked United to provide him with the specific guidelines it relied upon

and reminded United that it was obligated to act in his best interest. [Rec. 2020].

62. H.R. contended that D.R.'s treatment was medically necessary and that it was the opinion

of all of the medical professionals who had treated him on a first-hand basis that he

required the sub-acute treatment he was receiving. H.R. asked United on what basis it

disagreed with the recommendations of D.R.'s treatment providers. H.R. again requested

to be provided with a copy of the Plan Documents. [Rec. 2022-2024].

63. In a letter dated September 19, 2018, United upheld the denial of payment for D.R.'s

treatment. The letter gave the following justification for the denial:

> After reviewing the facility appeal documents, your request for Mental Health
> Residential Treatment reimbursement, and your behavioral health plan benefits, it is
> my determination that no authorization can be provided from 8/18/2017 forward.
> Your son attended Maple Lake Academy from 8/18/2017 to 8/31/2017. Maple Lake
> Academy is a "therapeutic boarding school." You are requesting reimbursement for a
> MH RTC level of care. This is a mismatch. The Facility's website indicates they are
> accredited as a Therapeutic School. There are no references to a Mental Health
> Residential Treatment level of licensure. As a therapeutic boarding school, facility
> documentation did not provide the scope or intensity of services that would meet the
> definition of a clinical residential treatment center, such as the regular use of a
> multidisciplinary team including independently licensed clinicians such as
> psychologists, psychiatrists, pediatricians, and licensed therapists who are constantly
> involved in the care of the individual. There is no documentation in the appeal record
> to substantiate the actual provision of Mental Health Residential Treatment level of
> care or service intensity. Evidence based mental health care was available in your
> community.

[Rec. 0545-0546].

64. On November 14, 2018, H.R. submitted a level two appeal of the denial of D.R.'s

treatment. He claimed that United had shifted its rationale for denying care by claiming

Maple Lake was a therapeutic boarding school. [Rec. 5346-5347; cf. 3510].

65. H.R. asserted that Maple Lake was a licensed residential treatment facility [Rec. 5346-5347; cf. 3510].

66. H.R. stated that he was unable to find anything on Maple Lake's website referring to itself as a boarding school and argued that just because a licensed residential treatment center had the word "academy" in its name did not reclassify it as a boarding school. [5362].

67. H.R. contended that United had disregarded his request for the Plan Documents and had still not provided him with a copy of the criteria it relied upon. H.R. argued that United's failure or refusal to produce these materials and its shifting denial rationale constituted a "willful disregard" of its duties under ERISA. H.R. questioned why United was avoiding a "good faith discussion" of the denial and accused it of altering its denial justification "*without considering or addressing any of the information we have submitted to them.*" (emphasis in original) [Rec. 5347-5348].

68. H.R. included an updated copy of D.R.'s medical records with the appeal. These records showed that D.R. continued to struggle with stealing and bullying behaviors [Rec. 5349; 5350; 5352], defiance [Rec. 5349; 5350; 5351], threats and acts of physical violence [Rec. 5349; 5350; 5351; 5352; 5353; 5354; 5355; 5356; 5359; 5360; 5361], self-harming [Rec. 5352; 5353] by hitting his head [Rec. 5355] against the wall [Rec. 5353; 5359], difficulty regulating emotions [Rec. 5349; 5351; 5354; 5355; 5356; 5360], suicidal ideation [Rec. 5353; 5354; 5356; 5359], and also showed that he was placed on one-to-one status [Rec. 5350; 5351; 5352] and suicide watch while in treatment. [Rec. 5359].

69. H.R. referenced D.R.'s repeated suicidal and homicidal ideation and his placement on suicide watch while he was in treatment and asked, "How many times does a child have

to verbalize his desire to die before insurance companies take them seriously?" [Rec. 5361].

70. H.R. contended that D.R. required a 24-hour residential setting in order to remain safe. H.R. argued that United had evidently not taken the time to review Maple Lake's licensure or fully reviewed the information he had included in his initial appeal and denied D.R.'s treatment in error. H.R. wrote that United had an obligation to pay for D.R.'s medically necessary care and its failure to do so had placed D.R. at significant risk. [Rec. 5362-5363].

71. H.R. once again directed United to respond to his questions and concerns individually and once more asked to be provided with a copy of the Plan Documents. [Rec. 5364].

72. In a letter dated February 8, 2019, United upheld the denial of payment for D.R.'s treatment. The reviewer wrote in part: [Rec. 5306]

> The noncoverage determination for residential level of care will be upheld on 8/18/2017 and forward. This is based on Optum Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines. Your child was being treated for chronic oppositional behaviors. He was not wanting to harm himself or others. He was often repsonsive [sic] to redirection. He was eating and sleeping well. It appears that his chronic behaviors could have been addressed in a less intensive setting with individual and family therapy, as well as medication management.

73. On March 18, 2019, H.R. requested that the denial of D.R.'s treatment be evaluated by an external review agency. H.R. asked that the denial be evaluated by an appropriately qualified reviewer with a specialization in D.R.'s diagnoses. H.R. again expressed concern that United had not provided him with clinical evidence to justify its denial nor had it stated how or if the Plan's definition of medical necessity impacted the decision to deny care. [Rec. 5319-5321].

74. H.R. stated that D.R.'s treatment was offered in accordance with the opinions of the medical professionals who had actively treated him. H.R. contended that either United was ignoring these recommendations, or "they have systematically implemented policies to restrict coverage for intermediate mental health services." [Rec. 5323].

75. H.R. wrote that the criteria United employed were problematic and utilized factors such as "not wanting to harm himself or others" as a justification for denying payment. H.R. wrote that this was an impermissible limitation for sub-acute residential treatment care and that United was not applying its guidelines consistently. [Rec. 5323-5324].

76. H.R. pointed out that the Optum Level of Care Guidelines for Residential Treatment clearly required that, "The member is not in imminent or current risk of harm to self, others, and/or property." H.R. noted that United seemed to be evaluating the medical necessity of D.R.'s treatment by relying on factors which were inconsistent with its own guidelines. He stated that United's rationale appeared to be sourced largely from its acute inpatient guidelines. H.R. asked for D.R.'s treatment to be evaluated under the terms of his insurance policy rather than any other guidelines. [Rec. 5324-5325].

77. H.R. argued that not only had United violated the terms of the insurance contract, but its misapplication of its own criteria also demonstrated a lack of parity under MHPAEA. H.R. stated that United did not require symptoms of acute dangerousness for care in a skilled nursing or inpatient rehabilitation facility to be approved. [Rec. 5325-5326].

78. H.R. accused United of systematically discriminating against mental health services and of disregarding generally accepted standards of medical practice. H.R. again requested to be provided with a copy of the Plan Documents. [Rec. 5327-5328].

79. In a letter dated July 1, 2019, the external reviewer upheld the denial of payment for

D.R.'s treatment. The reviewer gave the following justification for the denial: [Rec.

7256-7257]

> The patient is diagnosed with autism spectrum disorder, oppositional defiant disorder, major depressive disorder, and attention-deficit hyperactivity disorder. For the dates in question, the patient was not actively suicidal, homicidal, or gravely impaired for self-care. There was no report of self-harm. There was no report of auditory or visual hallucinations. The patient's chronic oppositional behaviors seemed to be at baseline status, and there is no reasonable expectation that his condition would further improve with continued treatment at this level of care.
> According to the plan definition, services and supplies are medically necessary when they meet all of the following:
> * In accordance with Generally Accepted Standards of Medical Practice.
> * Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your sickness, injury, mental illness, substance-related and addictive disorders, disease or its symptoms.
> * Not mainly for your convenience or that of your doctor or other health care provider.
> * Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnostic results as to the diagnosis or treatment of your sickness, injury disease or symptoms. [1]
>
> The residential treatment for the dates under review fails to meet the second and fourth criteria above. From the clinical evidence, the patient did not require residential level of care. His chronic, oppositional behaviors could have been safely treated in a less intensive setting. The patient could have been safely treated in a lower level of care with individual and family therapy, along with medication management. Therefore, the residential treatment on the dates of service from 8/18/17 to 10/4/18 was not medically necessary for this patient based on the applicable benefit plan language.
> Reference(s):
> 1. Medical Plan Summary Plan Description for Salaried and Union-Free hourly Employees. Effective: January 2016.
> 2. MCG. Residential Behavioral Health Level of Care, Child or Adolescent, 22nd Edition.

80. After United continually refused or failed to produce a copy of the documentation they

requested, the family wrote to the Committee in its capacity as Plan Administrator to

18

request the documents they had been denied. H.R. sent this request via registered mail

and confirmed delivery on May 26, 2020. [ECF 34-1, ECF 45].[1]

81. The family once again asked for:

- A complete copy of [D.R.]'s claim file
- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for our son, [D.R.] at Second Nature and Maple Lake, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [D.R.'s] claim;
- A complete copy of both the medical necessity criteria utilized by United Healthcare and United Behavioral Health in determining that [D.R.'s] treatment was not medically necessary and that treatment for him at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment.  This is necessary to allow us to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Complete copies of any and all internal records compiled by United Healthcare and United Behavioral Health in connection with [D.R.'s] claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [D.R.'s] insurance plan is operated; and
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you and United Healthcare and United Behavioral Health. [*Id.*].

82. Neither United nor the Plan Administrator responded to the Plaintiffs' requests for

documents. [Rec. *passim, See also* Exhibit 1].

83. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan

and ERISA as indicated by the Final Adverse Determinations made in United's denial

letters. [Rec. 1924, 5338.]

## **ARGUMENT**

---

[1] (This Court ordered [ECF 45] that the unsigned letter is part of the Record for consideration).

## I.    STANDARD OF REVIEW

The standard of review differs between Plaintiffs' causes of action. With respect to all three claims, the Court should grant summary judgment if Plaintiffs show that "there is no genuine dispute as to any material fact" and that Plaintiffs are "entitled to judgment as a matter of law."[2] However, when both parties to a cause of action involving wrongful denial of ERISA benefits under 29 U.S.C. § 1132(a)(1)(B) move for summary judgment, thereby effectively "stipulat[ing] that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[3] The default standard of review for a wrongfully denied claim is *de novo*, unless the claims administrator can demonstrate that it had discretionary authority to determine eligibility of benefits or interpret the terms of the Plan.[4]

By contrast, Plaintiffs' second (MHPAEA) and third (statutory penalties) causes of action have the contours of a more typical motion for summary judgment with the non-moving party entitled to the usual inferences in its favor. They are reviewed under the *de novo* standard of review.[5]

---

[2] Fed. R. Civ. P. 56(a).

[3] *LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 796 (10th Cir. 2010) (citation and internal quotation marks omitted).

[4] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)

[5] *See Beckstead v. EG&G Tech. Servs. Emple. Benefit Plan*, 2006 U.S. Dist. LEXIS 86158, at *8 (D. Utah 2006) (citing *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) for the proposition that "the determination of a Plan Administrator's compliance with ERISA's statutes and regulations is one of statutory interpretation in which the Court owes the Plan Administrator no deference.") *see also Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 694 (9th Cir. 1993) *Munnelly v. Fordham University Faculty & Administration HMO Ins. Plan*, 216 F.Supp.3d 714, 727 (S.D.N.Y. 2018)

II. **UNITED'S FAILURE TO ENGAGE WITH TREATING PROFESSIONAL OPINIONS NOR PROVIDE REASONED ANALYSIS AND CITATIONS TO THE MEDICAL RECORD REQUIRE REVERSAL.**

The Tenth Circuit has made clear that claims administrators must engage in a full and fair review when evaluating claims for benefits.[6] "For the claimant, then, the "full and fair" administrative review required by ERISA 'means 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'" [7]

The Tenth Circuit requires claims administrators to engage in a meaningful dialogue when claimants challenge their denials. ERISA and its implementing regulations require:

> a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied the reason for the denial must be stated in reasonably clear language[,] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters.[8]

*David P. v. United Healthcare Ins. Co.*, describes several errors that result in a reversal of a decision to deny benefits.[9]  Shifting denial rationale provides one justification for reversing a decision denying benefits.[10] The failure to engage with the opinions of treating care givers

---

[6] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023); *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1299-300 (10th Cir. 2023) (both citing 29 U.S.C. 1133).
[7]  David P. v. United Healthcare Ins. Co., 77 F.4th 1293, 1300 (10th Cir. 2023) (citing *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893-94 (10th Cir. 1988) (quoting *Grossmuller v. UAW*, Local 813, 715 F.2d 853, 858 n.5 (3rd Cir. 1983)).
[8] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1300 (10th Cir. 2023) (quoting Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1326 (10th Cir. 2009) (quoting Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 635 (10th Cir. 2003)).
[9] 77 F.4th 1293, 1300 (10th Cir. 2023)
[10] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1309 (10th Cir. 2023)

provides another reason to reverse a decision to deny benefits.[11] Additionally, administrators like United cannot rely on internal notes that were not communicated to the Plaintiffs in denial letters.[12] Any denial rationale must have been communicated to the claimant.[13] When denials suffer from these shortcomings they are arbitrary and subject to reversal.[14]

The five denial letters in this case make no mention of treating professional opinions nor the comprehensive psychological evaluation that recommended long term out-of-home care.[15] Plaintiffs also find no citation to the Plan provision or to particular medical records that would support the conclusion that D.R. was not eligible for coverage.[16] Following the reasoning of *D.K.* and *David P.*, the decision to deny benefits must be reversed as arbitrary and capricious. The remaining question on the denied benefits claim is whether the medical evidence is sufficiently clear to demonstrate that D.R. is entitled to benefits or the case should be remanded.

### III.   D.R.'s CARE AT SECOND NATURE AND MAPLE LAKE WERE MEDICALLY NECESSARY AND PLAINTIFFS ARE ENTITLED TO AN ORDER FOR COVERAGE.

#### A.  The Plan Documents Identify the Standards for Coverage

The summary plan description confirms that D.R. was entitled to coverage for treatment of his mental health disorders.[17] The summary plan description states that coverage for behavioral health benefits "is designed to provide flexible and consistent mental health and substance abuse benefits."[18] "Covered Behavioral Health services include those received on an

---

[11] *Id.* at 1310-1313.
[12] *Id.* 1313-13-14.
[13] *Id.* at 1313 (citing *D.K.,* 67 F.4th 1242-43).
[14] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1243 (10th Cir. 2023).
[15] Rec. 659, 1207-1209, 1923-1924, 3492-3493, 5337-5338.
[16] *Id.*
[17] Rec. 56-60.
[18] Rec. 56.

inpatient basis in a hospital or an alternate facility."[19] The following services are explicitly covered:

- Diagnostic Evaluations and assessment;
- treatment planning;
- inpatient or 24 hour supervisory care;
- services at a residential treatment facility;
- individual, family, therapeutic group and provider-based case management services. [20]

As described above and further discussed below, the medical records demonstrate that D.R. received these services and United was obligated to cover them.[21] D.R. received a comprehensive psychological evaluation at Second Nature, received individual and family therapy, and his therapist monitored his progress via a treatment plan.[22]

The discharge summary and other records from Maple Lake also show that D.R. met these provisions.[23] Admission to Maple Lake was based on recommendations from the wilderness therapist as well as Dr. Corelli.[24] D.R.'s treatment also satisfied the medical necessity definition of the Plan which requires treatment services to be:

- In accordance to generally accepted standards of medical practice.
- Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for your sickness, injury, mental illness, substance- related and addictive disorder, disease or its symptoms.
- Not mainly for your convenience of that of your doctor or other health care provider.
- Not more costly than an alternative drug, service(s) or supply that is a least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your sickness, injury, disease or symptoms.[25]

---

[19] Rec. 57.
[20] Rec. 58.
[21] Rec. 1297-1300, 2110-3482, 3513-3565, 5594-5596, 7995-8080.
[22] Rec. 7996-8001.
[23] Rec. 7995-8080.
[24] Rec. 5594.
[25] Rec. 41, 7244

As was detailed in the facts section above and will be discussed more fully below, all of D.R.'s previous treating clinicians recommended treatment at the levels of care that he received. The professionals highlighted that the treatment needed to be long term, and that it was clinically appropriate. The clinicians also confirmed that lower levels of care had not worked, created a risk of relapse, and would not provide the results that D.R. would receive at Second Nature and Maple Lake.

**B.  The Second Nature Denials Were Wrong.**

**1.  D.R.'s Admission to Second Nature was based on recommendations from treating providers who found that lower levels of care did not work.**

The medical records show that D.R. had been treated since 2010 by Ted Asay, Ph.D.[26] Beginning in 2016, Dr. Asay determined that "it was clear at that visit that there had been significant changes in [D.R.'s] behavior.[27] His problems negatively affected his experience at school and at home. D.R. had been suspended from school for fighting.[28] Furthermore, D.R.'s special education instructor wrote that "[D.R. struggled with motivation to complete his work, managing behavior and self control and anger outbursts."[29] By February 2017, D.R. was struggling with memories of a childhood sexual abuse and showing more signs of anger and depression.[30]  In April 2017, Dr. Asay recommended that D.R.'s parents should consider a structured treatment environment based on reports of physical aggression and the parents fear of "being physically hurt by D.R."

---

[26] Rec. 7386-7387, 8074-8076.
[27] *Id.*
[28] *Id.*
[29] Rec. 8080.
[30] Rec. 8075.

Dr. Asay's recommendations were confirmed by Sylvie-Queen Ekobena, a licensed professional counselor.[31] Ms. Ekobena described D.R.'s participation in outpatient therapy as "progress was not being made with an outpatient treatment program and quickly declining."[32] Due to D.R.'s continuing "oppositional and defiant behaviors" Ms. Ekobena "recommendated [D.R.]'s family place him in an inpatient program for troubled teenagers."[33]

While, at Second Nature, D.R. participated in a psychological evaluation conducted by Todd Corelli, Ph.D.[34] Dr. Corelli's diagnosis not only confirmed the need for the care received at Second Nature but completely refuted the suggestion by United that D.R. could have been safely treated at an intensive outpatient level of care.[35] Dr. Corelli concluded the following:

> In summary, D.R. struggles with several significant issues. These include poor coping skills, emotional immaturity, low self-esteem, depression, increasingly serious behavioral problems, defiant behaviors, deteriorating relationships with his parents, and social difficulties that consistent with autism spectrum disorder. Given the seriousness of these test findings, it is recommended that following his stay at Blue Ridge Wilderness, D,R, go on to a longer-term residential treatment program that can continue addressing each of these issues in depth.[36]

The medical records and recommendation by treating clinicians demonstrate D.R. met the medical necessity requirements for treatment at Second Nature.

### 2. The Denial Letters Did Not Adhere To Either The Plan Terms Or ERISA Regulations And The Decision To Deny Benefits Must Be Reversed.

United's denial letters failed to refute the evidence that D.R.'s treatment was medically necessary. [37] Additionally, United failed to meaningfully engage with the medical records and

---

[31] Rec. 8078.
[32] Rec. 8078.
[33] *Id.*
[34] Rec. 8059-8073.
[35] Rec. 8071-8073.
[36] Rec. 8072-8073.
[37] Rec. 1207-1209; 1923-1924.

the opinions of treating professionals. Finally, United's denial letters contained shifting rationales demonstrating the arbitrary basis of its decisions. These failures prove that United's denial process was arbitrary and capricious and must be reversed.

ERISA makes clear that when issuing an adverse benefit determination, an administrator must provide the participant "adequate notice in writing . . . setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."[38] After the administrator issues an adverse benefit determination, the participant is entitled to a "reasonable opportunity" for a "full and fair review" of the decision.[39] A "full and fair review" discloses to the participant the "evidence the decision-maker relied upon."[40] A district court's review is limited to "those rationales that were specifically articulated in the administrative record as the basis for denying a claim."[41]

The Tenth Circuit has also held that "the administrator must include its reasons for denying coverage in the four corners of the denial letter."[42]  "ERISA denial letters play a particular role in ensuring full and fair review. ERISA regulations require that denial letters be comprehensive and include ... specific reasons for the denial."[43] The terms of the Plan in this case restate the requirements of ERISA's claims procedure regulations and make them part of the Plan.[44]

---

[38] 29 U.S.C. § 1133(1).
[39] Id. § 1133(2).
[40] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1236 (10th Cir. 2023) (quoting *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893-94 (10th Cir. 1988)).
[41] *Spradley v. Owens-Illinois Hourly Emples. Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (citations omitted).
[42] *Ian C. v. UnitedHealthCare Ins. Co.*, No. 22-4082, 2023 U.S. App. LEXIS 32051, at *19-20 (10th Cir. Dec. 5, 2023) (quoting *D.K. v. United* 67 F.4th at 1239 10th Cir. 2023).
[43] *Id.* (citing 29 C.F.R. § 2560.503-1(f)(3), (h)(3)-(4)).
[44] Rec. 210-223.

In this instance, the denial letters make no reference to the letters of medical necessity and the comprehensive psychological evaluation.[45] Without explaining why its reviewers disagreed with the recommendations of treating providers, United failed to refute the medical basis for D.R. to receive treatment at Second Nature. Furthermore, because the four corners of the denial letters demonstrate the absence of a meaningful dialogue, the denials are subject to reversal as arbitrary and capricious.

Finally, each of the denial letters contain shifting rationales. In the first instance, United claimed that the services were unproven and experimental.[46] In response to this rationale, H.R. pointed out in his appeal that there was no exclusion for the services that Second Nature offered, and H.R. provided peer reviewed and other literature and documents showing that the treatment D.R. received was not experimental or investigational.[47] United ignored these arguments and abandoned its denial rationale in its subsequent letters.[48]

The second denial letter stated that D.R. was stable and did not require 24/7 services. United based that determination on the absence of suicidal and homicidal thoughts and not being "an imminent danger or harm to self or others."[49] United also stated that D.R. was not a "patient" and therefore had no clinical status. United also found unacceptable the treatment from a licensed practitioner. However, United failed to comply with its appeal responsibilities because it never identified a plan provision that required the conditions that United claimed Second Nature violated. United also failed to dispute or even engage with the opinions of D.R.'s treating professionals who demonstrated that D.R. required long term residential care.

---

[45] Rec. 659-660, 1207-1209, 1923-1924.
[46] Rec. 659.
[47] Rec. 677-682, 731-1194.
[48] Rec. 1207-1209, 1923-1924.
[49] Rec. 1207-1208.

However, the third denial letter abandons any notion of stabilization and stated that D.R. met the "Optum guidelines for mental health residential treatment."[50] Nonetheless because United claimed Second Nature did not meet a residential treatment center definition it still declined payment. Yet again, United failed to point to any Plan provision that required this outcome. On the contrary, United established the medical necessity of 24/7, just as D.R.'s treating providers agreed.

Under these circumstances the decision to deny benefits must be reversed.

## C. The Maple Lake Denials Were Wrong.

### 1. The Medical Records Prove that Treatment at Maple Lake was a Covered Benefit Under the Terms of the Plan.

Similar to the appeals that the family submitted regarding Second Nature, the family appeal letters contained medical records and letters of medical necessity to establish that D.R.'s care was both medically necessary and a covered benefit under the terms of the Plan.[51] In the Second Level Appeal, H.R. provided all of the medical records from Maple Lake and highlighted numerous examples of D.R.'s behavior that demonstrated the ongoing need for residential care.[52]

As discussed above, Dr. Corelli recommended a structured residential facility once D.R. finished his treatment at Second Nature. D.R.'s prior treating clinicians and his teacher all confirmed that he needed a higher level of care.[53] And the appeal letter contained specific entries that demonstrated how D.R. struggled with all of the following:

- Suicidal ideation,
- Violent and rude interactions with others,
- Verbal threats with plans to harm self and others,
- Anger and aggression, bullying,

---

[50] Rec. 1923
[51] Rec. 2018-2025, 5346-5364.
[52] 5348-5362
[53]

- High observation status and not maintaining program levels, and
- Refusal to follow instructions.[54]

All of these conditions demonstrated a need for residential treatment.

Possibly more important, during the evaluation process that United made as part of its review of the Second Nature claim, its own reviewers indicated that D.R. "met the Optum guidelines for mental health residential treatment."[55] The second level appeal was sent in March of 2019 and included the same letters of medical necessity and the comprehensive psychological, that were sent to United as part of the Maple Lake review. But during United's final review, its reviewer Edward Collopy found that between May 26, 2017, and August 16, 2017, D.R. qualified for residential treatment.

Other than being arbitrary and capricious, Defendants cannot explain how, D.R. no longer qualified for residential treatment at Maple Lake, two days following the discharge from Second Nature.

### 2. United's Denial Letters Fail to Refute the Clear Evidence that D.R.'s Treatment was a Covered Benefit.

In United's initial denial letter, United denied benefits claiming that Maple Lake was a therapeutic boarding school.[56] Earlier this year, Judge Jenkins noted in another case involving United that "United came early (or perhaps pre-disposed) to the view that Maple Lake was not a residential treatment center and, in turn, denied the claims on that basis as an excluded service."[57] And as in *C.P. v. United Healthcare*, Plaintiffs provided United with the state-issued license that confirmed Maple Lake provided "Residential Treatment" to adolescent youth, like

---

[54] Rec. 5348-5362; 5489-5539.
[55] Rec. 1923.
[56] Rec. 3492
[57] *C.P. v. United Healthcare Ins. Co.*, No. 2:21-cv-378-BSJ, 2023 U.S. Dist. LEXIS 108452, at *8-9 (D. Utah June 21, 2023)

D.R.[58] Judge Jenkins highlighted the administrative code in Utah requires educational services to adolescents in residential treatment programs. [59] "Maple Lake's provision of legally mandated educational programs does not convert otherwise covered residential treatment services into excluded services."[60]

As this case and *C.P.* demonstrate, United has been applying the unwarranted therapeutic school denial rational to services received at Maple Lake in particular for many years. United's attempt to use a wrongful denial basis is evidence that its decision-making was arbitrary and capricious. Furthermore, the original explanation of benefits claimed that the denial was because D.R. had not shown "measurable progress toward defined treatment goals."[61] This shifting denial rationale demonstrates that United was bent on denying benefits rather than engaging in a good faith meaningful dialogue that is part of a full and fair review.

In its final denial letter, United abandoned its therapeutic school arguments, but United still failed to mention or engage with any specific letter of recommendation, Second Nature's discharge summary, nor discuss the comprehensive psychological evaluation that recommended further residential treatment included in the family's second level appeal.[62] Instead, United described its review of the "appeal letter, case notes, and claims processing system."[63] These failures alone are sufficient under *D.K.* and *David P.* to reverse the decision as arbitrary and capricious. But the medical records show that D.R. continued to engage in behaviors that

---

[58] Rec. 5541-5542.
[59] *C.P. v. United Healthcare Ins. Co.*, No. 2:21-cv-378-BSJ, 2023 U.S. Dist. LEXIS 108452, at *20-22 (D. Utah June 21, 2023)
[60] *Id.* at *21-22.
[61] Rec. 2018.
[62] Rec. 5337-5338.
[63] Rec. 5337.

justified a payment of benefits. And United itself found that D.R. qualified for residential care at the same time he was admitted to Maple Lake.[64]

## IV.    UNITED'S MHPAEA VIOLATIONS WARRANT EQUITABLE RELIEF.

Recently the Tenth Circuit addressed the elements that are necessary to demonstrate a MHPAEA violation. While it did not mandate the following standard, it applied it for purposes of evaluating the case before it. The four elements, the Tenth Circuit identified are:

(1) Plausibly allege that the relevant group health plan is subject to MHPAEA;
(2) identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan;
(3) identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits; and
(4) plausibly allege a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog.[65]

Because this is a motion for summary judgment, Plaintiffs bear the burden of proving these elements.

Plaintiffs prove the first element because compliance with MHPAEA is a condition of the governing plan documents.[66] Further, because the obligation to comply with MHPAEA is part of the summary plan description, compliance with that statute constitutes one of United's fiduciary duties.[67] Thus, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

---

[64] Rec. 1923.
[65] *E.W. v. Health Net Life Ins. Co.*, No. 21-4110, 2023 U.S. App. LEXIS 30879, at *24-25 (10th Cir. Nov. 21, 2023)
[66] Rec. 56.
[67] 29 U.S.C. §1132(a)(3); Rec. 56.

The second element is met because Plaintiffs have demonstrated that United imposed acute symptom criteria to covered inpatient subacute care. Examples of these improper criteria for Second Nature are:

- Harm to self or others
- Denied homicidal thoughts.
- Not in imminent danger to self
- Not showing acute impairment[68]

The application of acute symptom criteria to subacute mental health care has been recognized by multiple courts in this district as a treatment limitation that violates MHPAEA.[69]

The Plaintiffs prove the third element by identifying the medical surgical analogue. The Department of Labor and district courts have recognized that skilled nursing and rehabilitation centers are analogues to care inpatient care at residential treatment centers and other intermediate inpatient facilities.[70] "[T]he Final Rules explain that '[p]lans and issuers must assign covered intermediate mental health and substance use disorder benefits to the existing six benefit classifications in the same way that they assign comparable intermediate medical/surgical benefits to these classifications.'"[71] The rules explain that "if a plan or issuer classifies care in skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan or issuer must likewise treat any covered care in residential treatment facilities for mental health or substance user disorders as an inpatient benefit." [72]

---

[68] Rec. 1208.

[69] *Jonathan Z. v. Oxford Health Plans*, No. 2:18-cv-00383-JNP-JCB, 2022 U.S. Dist. LEXIS 121033, at *59-61 (D. Utah July 7, 2022); *S.K. v. United Behavioral Health*, No. 2:18-cv-880-RJS-DBP, 2023 U.S. Dist. LEXIS 180360, at *99 (D. Utah Sep. 29, 2023).

[70] *Final Rules,* 78 Fed. Reg. at 68246.

[71] *E.W. v. Health Net Life Ins. Co.*, No. 21-4110, 2023 U.S. App. LEXIS 30879, at *38-39 (10th Cir. Nov. 21, 2023) quoting *Final Rules* 78 Fed. Reg. at 68247.

[72] *Id.*

Because Second Nature provided its services in a 24/7 away from home environment, it must also be classified as an inpatient service, like Maple Lake. The passages from the Final Rules demonstrate that care in an inpatient skilled nursing facility is analogous to care in a residential treatment center—which also provides inpatient care—for purposes of MHPAEA's parity requirement. [73] The medical record shows that at both Second Nature and Maple Lake D.R. received care, subject to a treatment plan, and that the care was of a subacute nature in that D.R. received individual and family therapy, group therapy, and developed skills to be able to return to a lower level of care. This type of care is intermediate in nature, because it is not acute like hospitalization and it is more intensive than in-home outpatient services.

For Maple Lake, which is licensed as a residential treatment center there is no question about the proper classification. But United cannot dispute that Second Nature also qualifies as an intermediate level of care for purposes of MHPAEA. Even though Second Nature's services are different than a traditional residential treatment center, Second Nature as a Residential level of care. [74] Thus, by its own classification, United acknowledges that Second Nature provides an intermediate level of care whose services would be comparable to a skilled nursing facility or an intermediate rehabilitation center.

As the Tenth Circuit acknowledged, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical

---

[73] *See also Danny P.*, 891 F.3d at 1158 & n.6 (implying that treatment at skilled nursing facilities and residential treatment centers is analogous under MHPAEA); *David P.*, 2020 U.S. Dist. LEXIS 21967, 2020 WL 607620, at *17 (same) (quoting *Kurt W.*, 2019 U.S. Dist. LEXIS 215210, 2019 WL 6790823, at *5); *E.M. v. Humana*, No. 2:18-cv-00789, 2019 U.S. Dist. LEXIS 167121, 2019 WL 4696281, at *3 (D. Utah Sept. 26, 2019) (same) (unpublished).
[74] Rec. 1207, 1923

benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

Plaintiffs prove the fourth element because United imposed a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog.[75] The medical necessity criteria used by United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

As part of discovery, Plaintiffs requested Defendants to produce medical/surgical guidelines that would be analogous to the guidelines that Defendants used when evaluating D.R.'s claims for benefits. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

United's final denial letter makes it clear that United "required D.R. to exhibit acute symptoms to qualify for care" at both Second Nature and Maple Lake.[78] As discussed above in both *Jonathan Z v. Oxford.* and *S.K. v. United*, district courts have found that the discussion of an

---

[75] *E.W. v. Health Net Life Ins. Co.*, No. 21-4110, 2023 U.S. App. LEXIS 30879, at *24-25 (10th Cir. Nov. 21, 2023)
[76] Rec. 8246-10544.
[77] *Id.*
[78] Rec. 5337.

absence of acute symptoms in a denial letter is an indication that the claims administrator was requiring acute symptoms in order to approve the claim.[79]

Likewise, United required that D.R. present with acute symptoms even though he was receiving subacute residential care. The final denial letter stated as a rationale for denial that D.R. "was not wanting to harm himself or others." [80] In the first place, that statement was false as established by the examples of suicidal ideation and threats to others that were found in the medical record and summarized in the family's appeal letter.[81] But suicidal ideation is also an example of an acute symptom.[82] Thus, in practice, United applied a more stringent requirement on D.R.'s claims for mental health care than it did for analogous medical/surgical care. United's practices violated MHPAEA because they resulted in a treatment limitation for D.R.'s care that would not apply to analogous medical/surgical care.

In addition, United failed to take into consideration D.R. safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.[83] In his appeal, H.R. posed the question of just how many times a person needed to threatened to kill themselves before insurers took them

---

[79] *Jonathan Z. v. Oxford Health Plans*, No. 2:18-cv-00383-JNP-JCB, 2022 U.S. Dist. LEXIS 121033, at *59-61 (D. Utah July 7, 2022); *S.K. v. United Behavioral Health*, No. 2:18-cv-880-RJS-DBP, 2023 U.S. Dist. LEXIS 180360, at *99 (D. Utah Sep. 29, 2023).
[80] Rec. 5337
[81] Rec. 5348-4362.
[82] *Jonathan Z. v. Oxford Health Plans*, No. 2:18-cv-00383-JNP-JCB, 2022 U.S. Dist. LEXIS 121033, at *61 (D. Utah July 7, 2022) (finding suicidal ideation, homicidal ideation, and hallucinations are acute symptoms).
[83] Rec. 41, 7244

seriously. [84] H.R. also provided medical proof that a lower level of care would not yield the same results but would place D.R. at risk of relapse. [85] Unless, United acknowledges that it does not look at relapse when evaluating coverage at skilled nursing facilities, this too is a MHPAEA violation.

## V.    THE COURT SHOULD IMPOSE STATUTORY PENALTIES AGAINST THE PLAN IN LIGHT OF THE FAILURE TO PRODUCE DOCUMENTS UNDER WHICH THE PLAN WAS OPERATED.

29 U.S.C. § 1024(b)(4) requires that:

> [A plan administrator] shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

The purpose of this requirement is to ensure that "plan participants and beneficiaries would be in a position to make informed decisions about how best to protect their rights."[86] Knowing where they stood was essential for Plaintiffs to understand how best to present their appeals to Defendants and position their case for potential litigation.

To encourage administrators to adhere to this statute, 29 U.S.C. § 1132(c)(1)(B) applies a penalty provision applicable "where [a] court finds a violation of 1024" which states that the administrator "may be liable, in the court's discretion, for penalties of up to [$110] per day for the failure to mail the requested materials within thirty days of the request."[87] While neither

---

[84] Rec. 5361.
[85] Rec. 8000
[86] *Moothart v. Bell*, 21 F.3d 1499, 1503 (10th Cir. 1994).
[87] *Id.*; *see also Dalton v. Chs/Cmty. Health Sys.*, 2014 U.S. Dist. LEXIS 123973, *2 (D.Utah 2014) (noting that courts are now entitled to impose a penalty of "up to $110 per day" as opposed to the previous $100 per day limit).

prejudice nor injury are prerequisites for this recovery, they are factors a court may consider in deciding whether to exercise its discretion to award a penalty.[88] However, the primary purpose of an award of statutory penalties is to punish a plan administrator and deter it from continuing to violate its fiduciary duties.[89]

A letter requesting plan documents was delivered to the Defendants on or about May 26, 2020.[90] In that letter, the family requested various document, including governing plan documents, standards, of medical necessity, and other logs and notes relevant to Plaintiffs' claims. Previously in this case, the Defendants objected to having the letter be part of the record, but the Court determined that the letter formed part of the prelitigation appeal record that the Court would consider.[91] A copy of that letter is attached hereto as Exhibit 1.

Because the Defendants, and in particular Corning as the Plan Administrator, did not timely respond, within 30 days, Corning is liable for the statutory penalties. Plaintiffs find no evidence in the Record that Defendants have ever provided or timely produced any administrative service agreements, governing plan documents or insurance documents or the medical necessity guidelines prior to this litigation. In response to discovery requests, Plaintiffs find the documents on September 26, 2022.[92]

Because there are 854 days between the date the letter was received and the date documents were produced, Corning is liable for 824 days, as the statute provides 30 days in which to produce the requested documents without penalty. Accordingly, in the exercise of its

---

[88] *See Moothart*, 21 F.3d at 1507; *see also Boone v. Leavenworth Anesthesia, Inc.*, 20 F.3d 1108, 1111 (10th Cir. 1994).
[89] *See Moothart*, 21 F.3d at 1506-07.
[90] ECF 34-3, Exhibit 2.
[91] ECF Doc. 45.
[92] Rec. 8246-10700.

discretion, this Court should impose statutory penalties of $110 per day from June, 25, 2020, to September 26, 2022, when the Defendants finally produced the relevant documents, including analogous guidelines and the administrative service agreement. This amounts to $90,640.

Plaintiffs also submitted requests to United as early as May 11, 2017, for these same Plan documents. Neither United, the Plan Administrator's agent for claims and appeals, nor Corning produced these documents until after litigation as described above. In the Court's discretion the amount of statutory damages could extend from 30 days after May 11, 2017.

## VI.    THE COURT SHOULD NOT REMAND THIS CASE TO DEFENDANTS.

If the Court grants Plaintiffs' Motion for Summary Judgment, the Court should not remand Plaintiffs' claims back to Defendants. Instead, if the Court finds that Plaintiffs prevail on their first (ERISA) cause of action, the Court should enter judgment in Plaintiffs' favor and order Defendants to pay for the treatment D.R. received at Second Nature and Maple Lake.[93] The medical records show that D.R. was eligible for the coverage that he received. To remand the issue again runs a significant and problematic risk of creating an unfair "heads we win; tails, let's play again" system of benefits adjudication in favor of defendant insurance companies.[94]

The Court also should not remand Plaintiffs' claims back to Defendants if it finds Plaintiffs prevailed on their second (MHPAEA) cause of action. As the Supreme Court has repeatedly stated, "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3) available to remedy a MHPAEA violation must fall within the forms of relief "typically available in equity." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).

---

[93] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1244 (10th Cir. 2023).
[94] *Tam v. First Unum Life Ins. Co.*, 2020 U.S. Dist. LEXIS 186477 (C.D. Cal. 2020) (citation and internal quotation marks omitted).

There is no basis to suggest that remand to an ERISA plan administrator when it is found to have wrongly denied medical benefits under the terms of the plan is a form of relief that was typically available in courts of equity. Instead, if the Court finds that Defendants violate MHPAEA, it should award Plaintiffs equitable relief in the form of an injunction,[95] specific performance,[96] disgorgement,[97] restitution,[98] surcharge,[99] or some combination of those remedies.

However, if the Court does decide to remand C.J.'s claims for a second review by Defendants, the Court should limit Defendants' potential bases for denial to those discussed in their denial letters in the pre-litigation appeal process. Federal appellate courts have recognized that such a restriction is permissible.[100]

## V.   PLAINTIFFS ARE ENTITLED TO THEIR ATTORNEYS' FEES AND TO PRE- AND POST-JUDGMENT INTEREST.

If the Court grants Plaintiffs' Motion for Summary Judgment, they request an award of

---

[95] 29 U.S.C. § 1132(a)(3)

[96] *See Texas v. N.M.*, 482 U.S. 124, 131 (1987) (noting "specific performance" is "an equitable remedy[,]" and explaining courts have broad discretion to award it); *Mardirossian v. Paul Revere Life Ins. Co.*, 286 F.3d 733, 736 (4th Cir. 2002) (noting specific performance is an "equitable remedy" and contemplating its use in the context of disability benefits).

[97] *See Liu v. SEC*, 140 S.Ct. 1936, 1942-1943 (2020) (noting that "[e]quity courts have routinely deprived wrongdoers of their net profits from unlawful activity" and that this "disgorgement of improper profits" is "traditionally considered an equitable remedy" (citation and internal quotation marks omitted))

[98] *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) ("[R]estitution is a legal remedy when ordered in a case at law and an equitable remedy when ordered in an equity case[.]" (alterations, citation, and internal quotation marks omitted), *Teets v. Great-West Life & Annuity Ins. Co.*, 919 F.3d 1232, 1256 ("Payment of restitution . . . can be equitable or legal.")

[99] The Supreme Court approved application of this "exclusively equitable" remedy where an ERISA plan fiduciary violated its statutory duties in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011)

[100] *See, e.g., Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012) ("[A] contrary rule would allow claimants, who are entitled to sue once a claim has been 'deemed denied' to be 'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced." (citation and internal quotation marks omitted).

attorney fees and costs based on 29 U.S.C. §1132(g) as the prevailing party in this litigation. Plaintiffs request the opportunity, if needed, to present in a future briefing additional information demonstrating why an award of prejudgment interest, attorney fees, and costs is appropriate.

## CONCLUSION

For the foregoing reasons, the Court should award summary judgment to Plaintiffs with respect to all of their causes of action.

DATED this 15th day of December, 2023.

/s/ Brian S. King
Brian S. King
Brent J. Newton
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs Motion for Summary Judgment has been served via the Court's CM/ECF system to all registered participants in this matter.

DATED this 15th day of December, 2023.

/s/ Brian S. King