IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| H.R., and D.R., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, the CORNING INCORPORATED BENEFITS COMMITTEE, and the CORNING MEDICAL WELFARE-HEALTH PLAN, <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:21-cv-00386-RJS-DBP <br><br> Chief District Judge Robert J. Shelby <br><br> Chief Magistrate Judge Dustin B. Pead |

Plaintiff H.R. is Plaintiff D.R.'s father.  H.R. is a participant in and D.R. is a beneficiary under Defendant Corning Medical Welfare-Health Plan (the Plan), governed by the Employee Retirement Income Security Act (ERISA).[1]  Defendant Corning Incorporated Benefits Committee is the plan administrator.  Defendant United Behavioral Health (UBH) is the Plan's designated behavioral health claims administrator and a claim fiduciary for the Plan.

From May 2017 to October 2018, D.R. was treated at Second Nature Blue Ridge (Second Nature) in Georgia and Maple Lake Academy (Maple Lake) in Utah for mental and behavioral health issues.  Defendants repeatedly denied Plan coverage for D.R.'s treatment at both facilities. Plaintiffs initiated this action claiming: 1) Defendants' wrongful denial of benefits breached fiduciary duties under ERISA, 29 U.S.C. § 1132(a)(1)(B); 2) the denials violated the Mental Health Parity and Addiction Equity Act (Parity Act), 29 U.S.C. § 1132(a)(3); and 3) Defendants'

---

[1] 29 U.S.C. § 1001 *et seq.*

1

failure to produce Plan documents requested by Plaintiffs warrants an award of statutory

penalties, 29 U.S.C. § 1132(a)(1)(A) and (c).[2]

     Now before the court are cross-motions for summary judgment.[3]  For the reasons

discussed below, both motions are GRANTED in part and DENIED in part.

## I.     FACTUAL BACKGROUND[4]

### A.     The Factual Record for Summary Judgment

     H.R. is D.R.'s father.[5]  The Plan is a self-funded employee welfare benefits plan under

ERISA, 29 U.S.C. § 1001 et. seq.[6]  At all relevant times, H.R. and D.R. were a participant and

beneficiary, respectively, of the Plan.[7]  The Corning Incorporated Benefits Committee was the

named plan administrator and UBH was the designated claims administrator for mental health

benefits.[8]  UBH also uses the brand name Optum.[9]

### 1.     D.R.'s History

     After being sexually abused by a babysitter when he was seven years old, D.R. began

receiving therapy from Dr. Ted Asay, Ph.D., for behavioral issues, including anger and

---

[2] Dkt. 2, *Complaint* at 16–23.  All citations to the parties' filings will refer to the page numbers on the court's CM/ECF pagination.  Citations to the Administrative Record (A.R.) will refer to the Bates-numbered pagination in the lower right-hand corner of the documents, UNITED ######.

[3] Dkt. 70, *Defendants' Motion for Summary Judgment* [SEALED] (*Defendants' MSJ*); Dkt. 72, *Plaintiffs' Motion for Summary Judgment* [SEALED] (*Plaintiffs' MSJ*).

[4] In evaluating cross-motions for summary judgment, the court must present a neutral summary of the facts.  *Stella v. Davis Cnty.*, No. 1:18-cv-002, 2019 WL 4601611, at *1 n.1 (D. Utah Sept. 23, 2019).  Except where otherwise noted, the relevant facts are undisputed.

[5] *Plaintiffs' MSJ* at 3.

[6] *Id.*; *Defendants' MSJ* at 6–7.

[7] *Plaintiffs' MSJ* at 3; *Defendants' MSJ* at 7.

[8] *Plaintiffs' MSJ* at 3; *Defendants' MSJ* at 6–7 (citing A.R. 56, 76, 107, 185, 188).  Medical and surgical claims under the Plan are administered by United Healthcare.  *Defendants' MSJ* at 7 (citing A.R. 77).

[9] *Plaintiffs' MSJ* at 4.

defiance.[10]  D.R. often stole from others and lied about it when confronted, was increasingly violent and physically aggressive towards family members and peers, and was suspended from school on multiple occasions.[11]  In April 2017, Asay recommended D.R. be treated in an intermediate residential treatment program.[12]  Shortly thereafter, D.R. began seeing a new therapist, Sylvie-Queen Ekobena, LPC, who also recommended D.R. be enrolled in an inpatient treatment program.[13]

Following these recommendations, D.R. was admitted to Second Nature on May 26, 2017.[14]  Second Nature is a "licensed adolescent treatment program that utilizes the experiential opportunities of a wilderness setting with a clinically focused intervention."[15]  Anne Wilzbacher, LPC, was D.R.'s treating clinician.[16]  Wilzbacher coordinated D.R.'s treatment plan and, along with residential staff, monitored D.R.'s completion of therapeutic assignments.[17]  D.R. participated in group therapy and received weekly individual psychotherapy and family

---

[10] *Plaintiffs' MSJ* at 6 (citing A.R. 7384, 7386).  These citations are to Plaintiffs' narrative of D.R.'s medical history from their level two appeal letter for Plaintiffs' Second Nature claim.  Defendants dispute them to the extent they selectively cite D.R.'s medical history and ignore contemporaneous facts supporting Defendants' denial of Plaintiffs' claims.  The court does not understand Defendants to dispute the accuracy of these facts as they pertain to D.R.'s medical history.

[11] *Id.*

[12] *Id.* (citing A.R. 7385).

[13] *Id.*

[14] *Id.* (citing A.R. 659).

[15] *Id.* at 7 (citing A.R. 7998, D.R.'s Discharge Summary from Second Nature).  Defendants do not dispute the contents of the Discharge Summary but dispute Plaintiffs' selective citations from it which "include argumentative summaries that mischaracterize and/or provide incomplete information concerning the cited record."  Dkt. 71, *Defendants' Opposition to Plaintiffs' Motion for Summary Judgment* (*Defendants' Opposition*) at 7.  Where appropriate, the court provides complete citations from the administrative record.

[16] *Id.* (citing A.R. 7998).

[17] *Id.* (citing A.R. 7998–8073).

intervention.[18]  While at Second Nature, Dr. Todd Corelli, Ph.D., conducted a psychological assessment of D.R. and diagnosed him with autism spectrum disorder, oppositional defiant disorder, major depressive disorder, attention-deficit hyperactivity disorder, executive functioning deficits, and a parent child relational problem.[19]

D.R. was discharged from Second Nature on August 16, 2017.[20]  Upon discharge, Wilzbacher noted D.R. "gradually became motivated to make progress at [Second Nature], and enjoyed the relative stability of the wilderness setting as a chance to 'regroup' and experience some success."[21]  However, she expressed concern D.R. was at "risk for relapsing . . . if he were to return to his home environment after completing our program."[22]  According to Wilzbacher, "[r]eturning to his home environment, even with intensive outpatient therapy or school accommodations, would most likely result in significant regression and a return to his previous level of functioning."[23]  To avoid this, she recommended D.R. "go directly from [Second Nature] to his next placement.  Returning home, even for a few days, would place him at great risk for regression in functioning and would undo much of the progress that he has made at [Second Nature]."[24]

---

[18] *Id.* (citing A.R. 7998).

[19] *Id.* (citing A.R. 8073).

[20] A.R. 8000.

[21] *Id.*; *see Plaintiffs' MSJ* at 7.

[22] A.R. 8000; *see Plaintiffs' MSJ* at 7.

[23] A.R. 8000; *see Plaintiffs' MSJ* at 7.

[24] A.R. 8000; *see Plaintiffs' MSJ* at 7.

Two days after his discharge from Second Nature, D.R. was admitted to Maple Lake for continued mental and behavioral health treatment.[25]  Maple Lake is licensed by the State of Utah as a residential treatment facility.[26]  It provides sub-acute inpatient therapeutic treatment to adolescents with mental health, behavioral, and substance abuse problems.[27]

Residential staff notes from D.R.'s time at Maple Lake indicate he continued to struggle with behavioral challenges.  On September 11, 2017, D.R. was "defiant to staff" and "pushed another student away when that student pointed at" him.[28]  On October 31, 2017, he hit "staff on the arm and shoulder" when they confiscated an iPod he was not permitted to have.[29]  After getting upset on December 1, 2017, D.R. "ended up punching a wall."[30]  D.R. also occasionally exhibited self-harming behavior.  For example, on December 10, 2017, he scratched himself, though "[t]he scratch didn't look that bad by evidence of no blood and no visible marks except by what looked like some light finger nail marks."[31]  Later in December, D.R. stated "he would rather kill himself than go to class" and began "hitting his head on the wall."[32]  Similarly, on December 13, 2017, D.R. stated "he wanted to hurt himself and that his life wasn't valuable to

---

[25] *Plaintiffs' MSJ* at 13.  The parties do not directly address the structure of Maple Lake's program or the treatment D.R. received while enrolled.  The court derives these background facts from its review of the A.R. and the parties' claims processing discussion.

[26] *Id.* at 15 (citing A.R. 3510).

[27] *Id.* at 4.

[28] A.R. 5349; *see Plaintiffs' MSJ* at 15.  The following quotations are drawn from the medical records cited in Plaintiffs' level two appeal of UBH's adverse benefit determination for D.R.'s treatment at Maple Lake.  Defendants do not dispute the accuracy of the cited records but dispute Plaintiffs' "argumentative summaries" and selective presentation.  *Defendants' Opposition* at 8–9.  For these purposes, the court does not rely on Plaintiffs' characterization of the records, only the substance of the records themselves.

[29] A.R. 5352; *see Plaintiffs' MSJ* at 15.

[30] A.R. 5352; *see Plaintiffs' MSJ* at 15.

[31] A.R. 5353; *see Plaintiffs' MSJ* at 15.

[32] A.R. 5353; *see Plaintiffs' MSJ* at 15.

him."[33]  At times, staff reported D.R. "was acting unsafe" and were concerned "he would hurt

himself or others."[34]  After spending over a year at Maple Lake, D.R. was discharged on October

4, 2018.[35]

### 2. Claims Administration and Appeals Process

The Corning Incorporated Benefits Committee is the plan administrator.[36]  The Plan

gives administrators "complete authority, in their sole and absolute discretion, to construe the

terms of the plans; to resolve any and all ambiguities or inconsistencies; and to decide the

eligibility for, and the extent of, benefits under the plans.  All decisions of the plan

administrators shall be final and binding upon all parties affected."[37]  The Plan also provides

"Corning has delegated to United Healthcare the discretion and authority to decide whether a

treatment or supply is a covered health service and how the eligible expenses will be determined

and otherwise covered under the Plan."[38]  Pursuant to this delegation, UBH administers

behavioral health claims under the Plan.[39]

The Plan provides an internal appeals process for claimants to seek review of adverse

benefits determinations.[40]  After an appeal is filed, a health care professional with experience in

the relevant field will review the information in the claim file and "any new information

---

[33] A.R. 5353; *see Plaintiffs' MSJ* at 15.

[34] A.R. 5354; *see Plaintiffs' MSJ* at 15.

[35] A.R. 5348.

[36] *Defendants' MSJ* at 7 (quoting A.R. 56, 185).

[37] *Defendants' MSJ* at 7 (quoting A.R. 74).

[38] *Id.* (quoting A.R. 40).

[39] *Id.* (citing A.R. 56).

[40] *Plaintiffs' MSJ* at 5 (citing A.R. 1367).

submitted to support the appeal."[41]  If the claim is denied on appeal, the claimant will receive a

written notification of the denial, communicating "in a manner calculated to be understood by

the claimant:"

- The specific reasons for the denial;

- References to the specific Plan provisions on which the benefit determination was based;

- A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits;

- A description of the Plan's review procedures and applicable time limits;

- A statement that the claimant has the right to obtain, upon request and free of charge, a copy of internal rules or guidelines relied upon in making this determination, and if the adverse determination is based on medical necessity or experimental treatment or a similar exclusion or limit, either an explanation of the scientific or clinical judgment, applying the terms of the Plan to the claimant's medical circumstances, or a statement that this will be provided free of charge upon request.[42]

If the level one appeal is denied, claimants may submit a level two appeal within 180 days of

receipt of the written notice of denial.[43]  Claimants may include any information supporting the

claim and, if the level two appeal is denied, the Plan Administrator must again provide a written

notification explaining the denial.[44]

---

[41] A.R. 1367.

[42] *Plaintiffs' MSJ* at 5 (quoting A.R. 1367).

[43] A.R. 1367.

[44] *Id.*

### 3. Plan Coverage Terms and Optum Level of Care Guidelines

The Plan provides coverage for medical, surgical, and behavioral health claims that are

"medically necessary."[45]  The Plan defines "medically necessary" as:

> [H]ealth care services provided for the purpose of preventing, evaluating, diagnosing or treating a sickness, injury, mental illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as determined by the Claims Administrator or its designee, within the Claims Administrator's sole discretion.  The services must be:

- In accordance with Generally Accepted Standards of Medical Practice.

- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your sickness, injury, mental illness, substance-related and addictive disorders, disease or its symptoms.

- Not mainly for your convenience or that of your doctor or other health care provider.

- Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic result as to the diagnosis or treatment of your sickness, injury, disease or symptoms.[46]

Generally Accepted Standards of Medical Practice are:

> standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.[47]

Behavioral health services "that are not clinically necessary" or those "that are considered

investigational because they do not meet generally accepted standards of medical practice in the

United States," are expressly excluded from coverage.[48]

---

[45] *Id.* (citing A.R. 41).

[46] *Id.* at 7–8 (quoting A.R. 41); *Plaintiffs' MSJ* at 5.

[47] *Defendants' MSJ* at 8 (quoting A.R. 41).

[48] *Id.* (quoting A.R. 59).

The Plan covers medically necessary behavioral health services at both inpatient and outpatient levels of care.[49]  This includes intermediate services such as care at a residential treatment center (RTC).[50]  Intermediate services provide 24-hour care for those who do not require the intensity of services provided in a hospital setting.[51]

For treatment at an RTC to be medically necessary, the Plan member must require 24-hour a day, seven days a week treatment for symptoms that interfere with the member's or others' safety or would "undermine engagement in a less intensive level of care without the intensity of services offered in" an RTC.[52]  As an intermediate service, treatment at an RTC is only medically necessary if the Plan member's condition is not so severe as to require the more intensive services of a hospital setting, while still severe enough to require 24-hour supervision.[53]

At the time of Plaintiffs' claims, UBH used the Optum Level of Care Guidelines for Mental Health Conditions (LOC Guidelines) to evaluate requests for RTC benefits.[54]  The LOC Guidelines use scientifically-based clinical evidence to establish criteria for coverage of RTC treatment.[55]  Among other criteria, the LOC Guidelines provide that admission at an RTC is medically necessary if a "member is not in imminent or current risk of harm to self, others, and/or property" and  "[t]he factors leading to admission cannot be safely, efficiently, or

---

[49] A.R. 57.

[50] *Defendants' MSJ* at 9 (citing A.R. 232–33).

[51] *Id.* (citing A.R. 232).

[52] *Id.* (quoting A.R. 233).

[53] *Id.* at 9–10 (citing A.R. 232–33).

[54] *Id.* at 10 (citing A.R. 224–37).  The Plan also provides coverage for treatment at a skilled nursing facility (SNF) or inpatient rehabilitation facility (IRF)—the intermediate inpatient medical and surgical analogs to RTC treatment. United, the administrator for medical and surgical benefits, evaluates medical necessity for SNFs and IRFs using the criteria set forth in the 21st and 22nd editions of the Milliman Care Guidelines (MCG).  The MCG was developed using scientifically based clinical evidence to establish the evaluation criteria.  *Defendants' MSJ* at 10–11.

[55] *Id.* at 10 (citing A.R. 232–33).

effectively assessed and/or treated in a less intensive setting."[56]  The LOC Guidelines set forth

best practices used in evaluating RTCs for coverage.  They suggest a "psychiatrist, in

conjunction with the treatment team, completes the initial evaluation commensurate with the

member's needs, no later than 24 hours following admission" and "[a] psychiatric consultation

occurs at least weekly commensurate with the member's needs."[57]

UBH also applies the Behavioral Clinical Policy for Wilderness Therapy to assist "in

interpreting and administering behavioral health benefit plans . . . ."[58]  This policy provides

"[w]ilderness therapy is unproven and not medically necessary for the treatment of emotional,

addiction, and/or psychological problems" because "[t]here is inadequate evidence of the safety

and efficacy of wilderness therapy for treating these mental health and substance-related

conditions."[59]  "Inadequate study designs, safety concerns, inadequately trained staff, and

questions of long-term benefit are key limitations."[60]

### 4. Plaintiffs' Claims for Plan Benefits

#### a. Second Nature

##### i. Initial Denial

Following D.R.'s discharge from Second Nature on August 16, 2017, Plaintiffs

retroactively submitted a claim for coverage under the Plan.[61]  On November 17, 2017, UBH

---

[56] A.R. 233.

[57] A.R. 233.

[58] A.R. 7949; *Defendants' MSJ* at 7.

[59] A.R. 7950; *Defendants' MSJ* at 7.

[60] A.R. 7950; *Defendants' MSJ* at 7.

[61] *Defendants' MSJ* at 11.

issued a written letter denying all coverage for D.R.'s stay at Second Nature.[62]  In relevant part, the letter stated:

> Your child was admitted for intensive treatment of her [sic] emotional dysregulation around 05/26/2017 at Blue Ridge Therapeutic Wilderness [Second Nature].  Optum has determined its wilderness therapy program to be an experimental or unproven treatment.  It is not covered under his health plan benefit.  He could have received treatment for his condition with Intensive Outpatient services.[63]

The initial adverse benefit determination letter was issued by Dr. Kaizad Munshi, a UBH Medical Director board-certified in psychiatry and child psychiatry.[64]

### ii.    Level One Appeal

On May 11, 2018, H.R. submitted a level one appeal of the adverse benefit determination.[65]  H.R. disagreed with UBH's "determination that [D.R.]'s treatment at Second Nature was experimental or unproven."[66]  He detailed UBH's obligations under ERISA, including the requirements of the Parity Act, and asserted Second Nature is an intermediate level mental health treatment facility licensed by the State of Georgia.[67]  H.R. requested that UBH respond and address how it was interpreting the Plan, how its exclusion of coverage for Second Nature complied with the Parity Act, and how it determined Second Nature provides

---

[62] *Id.*; *Plaintiffs' MSJ* at 7.

[63] A.R. 659; *Plaintiffs' MSJ* at 7; *Defendants' MSJ* at 11.

[64] A.R. 660; *Defendants' MSJ* at 11.

[65] *Plaintiffs' MSJ* at 7; *Defendants' MSJ* at 11.  *See also* A.R. 674–683.

[66] A.R. 674; *Plaintiffs' MSJ* at 8.

[67] A.R. 675–76; *Plaintiffs' MSJ* at 8.

experimental treatment.[68]  Along with the appeal letter, H.R. also submitted numerous articles purporting to demonstrate the efficacy of outdoor behavioral health treatment.[69]

On October 12, 2018, UBH upheld its initial adverse benefit determination in a written letter issued by Dr. Howard Wong, a UBH Medical Director board-certified in adult and child/adolescent psychiatry.[70]  Wong stated his review was based on the Optum Case Notes, H.R.'s Letter of Appeal, clinical records from the provider, the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care, the Common Criteria and Clinical Best Practices for All Levels of Care, and the Optum Behavioral Clinical Policy for Wilderness Therapy.[71]

Wong first explained D.R.'s treatment at Second Nature did not meet the LOC Guidelines for behavioral health benefits because D.R's "condition appeared to be stabilized to the extent that he did not require a facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to prevent harm to himself or others."[72]  He asserted D.R.,

> did not need frequent assessment and diagnosis and/or treatment planning, with 24/7 monitoring.  He had consistently denied suicidal or homicidal thoughts.  He was not self-harming or aggressive towards others.  He was not an imminent danger of harm to self or others.  The member was cooperative, responsive to staff, medication adherent, and doing better.  He had no reported behavioral problems and was cooperative with care.  He was participating in all aspects of his treatment.  He was medically stable, with adequate sleep, appetite, and self-care.  He did not have any medication changers [sic] and was not experiencing side effects or showing acute impairment to behavior or cognition.  He continued to have baseline impulsivity and reactivity related to his diagnoses of ADHD and ODD, and he was

---

[68] A.R. 676–77; *Plaintiffs' MSJ* at 8.

[69] *Plaintiffs' MSJ* at 8–9; A.R. 7502–7654.

[70] *Defendants' MSJ* at 11; *Plaintiffs' MSJ* at 9; A.R. 1207–09.

[71] A.R. 1207.

[72] A.R. 1207–08; *Plaintiffs' MSJ* at 9.

also newly assessed as having ASD with social impairments . . . . There were no clinical barriers preventing the member from transitioning to a less intensive level of care.

Care could have continued in the Mental Health Intensive Outpatient Program setting.[73]

After discussing why he concluded D.R.'s treatment at the intermediate inpatient level of care was not medically necessary, Wong explained Second Nature did not qualify for coverage as an RTC.[74]  According to Wong, his review of Second Nature indicated the facility was a wilderness therapy program, which as "the family was advised . . . is not a covered benefit."[75] Second Nature did not have a psychiatrist on staff and D.R. "did not have a psychiatric evaluation performed by a psychiatrist within 24 hours of admission."[76]  Further, D.R. "did not have weekly consultation by a psychiatrist to assess progress or the member's needs."[77]  Wong concluded "[t]he program does not appear to meet the common clinical best practices to provide level of intensity of programming expected in a mental health residential treatment center (RTC)."[78]

### iii.    Level Two Appeal

H.R. submitted a level two appeal on March 26, 2019.[79]  H.R. stated UBH's first appeal decision appeared to have "shifted [its] denial reason" from the original denial, with UBH now

---

[73] A.R. 1208; *Plaintiffs' MSJ* at 9–10.

[74] A.R. 1208; *Plaintiffs' MSJ* at 10; *Defendants' MSJ* at 11–12.

[75] A.R. 1208; *Plaintiffs' MSJ* at 10; *Defendants' MSJ* at 11–12.

[76] A.R. 1208; *Plaintiffs' MSJ* at 10; *Defendants' MSJ* at 12.

[77] A.R. 1208; *Plaintiffs' MSJ* at 10; *Defendants' MSJ* at 12.

[78] A.R. 1208; *Plaintiffs' MSJ* at 10; *Defendants' MSJ* at 12.

[79] *Plaintiffs' MSJ* at 10; *Defendants' MSJ* at 12.

determining Second Nature did not provide the intensity of care required of an RTC and that D.R. did not require treatment in an RTC.[80]

H.R. contended Second Nature was a licensed outdoor behavioral health facility and UBH's denial violated the Parity Act by imposing restrictions on mental health treatment it does not impose on medical and surgical benefits.[81]  He further asserted UBH's level one appeal decision violated the Parity Act by seeming to require acute level symptoms to qualify for intermediate inpatient mental health treatment, stricter requirements than those imposed for analogous medical and surgical care.[82]  For example, UBH determined D.R.'s treatment in an RTC was not necessary because he denied suicidal or homicidal thoughts and did not pose an imminent danger of harm to himself or others.[83]  However, H.R. explained, the LOC Guidelines establish intermediate treatment in an RTC may be necessary when, among other things, the "member is not in imminent or current risk of harm" to self or others.[84]

H.R. also disputed UBH's determination that D.R.'s treatment at an RTC was not medically necessary.[85]  He provided a detailed summary of D.R.'s medical history and contended it was the opinion of the mental health professionals who had treated D.R. that he required the level of care he received.[86]  H.R. included letters of medical necessity from D.R.'s previous care providers, Asay, Ekobena, and Kera Pavelka, one of D.R.'s prior special education instructors.[87]

---

[80] *Plaintiffs' MSJ* at 10; A.R. 1907.

[81] *Plaintiffs' MSJ* at 10–11; A.R. 1909–10.

[82] *Plaintiffs' MSJ* at 11; A.R. 1912.

[83] *Plaintiffs' MSJ* at 11; A.R. 1912.

[84] *Plaintiffs' MSJ* at 11; A.R. 1912.

[85] *Plaintiffs' MSJ* at 11–12; A.R. 1913–17.

[86] *Plaintiffs' MSJ* at 12; A.R. 1915.

[87] *Plaintiffs' MSJ* at 11–12; A.R. 1915–17.

Asay's letter detailed his years-long history treating D.R. and noted his April 2017 recommendation that, if D.R. continued to have behavioral issues, his parents "should consider placement in a more structured, intensive treatment environment, such as a residential treatment program."[88]  Similarly, after discussing her experience with D.R., Ekobena noted that while treating D.R., "[h]is oppositional and defiant behaviors continued and I recommended his family place him in an inpatient program for troubled teenagers.  Progress was not being made with an outpatient treatment and he was quickly declining."[89]  Pavelka noted that over her two years of working with D.R., "[h]e struggled with motivation to complete his work, managing behavior and self-control and anger outbursts."[90]  According to Pavelka, he "often displayed outbursts of anger and frustration towards adults and his peers" which "inhibited his success in the classroom and socially."[91]

On June 3, 2019, UBH issued a final adverse appeal determination in a written letter from Dr. Edward Collopy, a UBH Medical Director board-certified in psychiatry and neurology psychiatry.[92]  Collopy stated coverage for D.R.'s treatment at Second Nature was "not available" because "[a]fter reviewing the medical records, the programming described did not adhere to the Optum clinical best practices for treatment in a mental health residential setting.  Namely, there was no initial nor ongoing assessment by a psychiatrist during your son's treatment episode."[93]

---

[88] A.R. 1916.

[89] A.R. 1917.

[90] *Id.*

[91] *Id.*

[92] *Defendants' MSJ* at 12; *Plaintiffs' MSJ* at 13; A.R. 1923–24.

[93] A.R. 1923; *Plaintiffs' MSJ* at 13; *Defendants' MSJ* at 12.

Collopy concluded D.R. "could have received care in a mental health residential treatment setting that met the Optum guidelines for mental health residential treatment."[94]

### b.  Maple Lake

#### i.  Initial Denial

D.R. was admitted to Maple Lake on August 18, 2017.[95]  In February, March, April, June, and July 2018, UBH issued Explanation of Benefits (EOB) statements denying coverage for D.R.'s treatment at Maple Lake.[96]  The EOBs denied benefits under code S8 and stated:

> Your Plan provides benefits for services that are determined to be covered health services.  The information received does not support measurable progress toward defined treatment goals for these services.  Therefore, additional benefits are not available.[97]

#### ii.  Level One Appeal

On August 17, 2018, H.R. submitted a level one appeal of the denial of benefits for D.R.'s treatment at Maple Lake.[98]  H.R. reiterated UBH's obligations under ERISA, asked it to take account of the information he provided, and requested it provide him with the specific guidelines and Plan documents it relied upon in making its determination.[99]  He argued D.R.'s treatment was medically necessary, providing a detailed summary of D.R.'s medical history and the letters of medical necessity from past providers.[100]  He included the findings of the psychological evaluation conducted while D.R. was at Second Nature which recommended

---

[94] A.R. 1923; *Plaintiffs' MSJ* at 13.

[95] *Plaintiffs' MSJ* at 13; *Defendants' MSJ* at 12.

[96] *Plaintiffs' MSJ* at 13; *Defendants' MSJ* at 12–13.

[97] *Plaintiffs' MSJ* at 13; *Defendants' MSJ* at 13; A.R. 2030–46.

[98] *Plaintiffs' MSJ* at 13; *Defendants' MSJ* at 13; A.R. 2018–20.

[99] A.R. 2018–20; *Plaintiffs' MSJ* at 13–14.

[100] A.R. 2020–24; *Plaintiffs' MSJ* at 14.

D.R's "significant issues" warranted treatment in "a longer-term residential treatment program that can continue addressing each of [D.R.'s] issues in depth."[101]

On September 19, 2018, UBH upheld the denial in a written letter issued by Dr. Kenneth Fischer, a UBH Medical Director board-certified in adult and child psychiatry.[102]  After reviewing the letter of appeal and the Plan documents, Fischer determined benefits coverage was "not available" because "Maple Lake Academy is a 'therapeutic boarding school'" but H.R. was "requesting reimbursement for a [mental health] RTC level of care."[103]  According to Fischer, this was a "mismatch" because,

> facility documentation did not provide the scope or intensity of services that would meet the definition of a clinical residential treatment center, such as the regular use of a multidisciplinary team including independently licensed clinicians such as psychologists, psychiatrists, pediatricians, and licensed therapists who are constantly involved in the care of the individual.[104]

Fischer found "no documentation in the appeal record to substantiate the actual provision of Mental Health Residential Treatment level of care or service intensity."[105]  He concluded "[e]vidence based mental health care was available in your community."[106]

### iii.   Level Two Appeal

On November 14, 2018, H.R. submitted a level two appeal of UBH's denial of benefits for D.R.'s treatment at Maple Lake.[107]  H.R. contended UBH "seems to be shifting [its] denial rationale" from medical necessity to scope of service, and disputed UBH's conclusions on both

---

[101] A.R. 2023; *Plaintiffs' MSJ* at 14.

[102] *Defendants' MSJ* at 13; *Plaintiffs' MSJ* at 14; A.R. 3492–93.

[103] A.R. 3492; *Defendants' MSJ* at 13; *Plaintiffs' MSJ* at 14.

[104] A.R. 3492–93; *Defendants' MSJ* at 13; *Plaintiffs' MSJ* at 14.

[105] A.R. 3493; *Defendants' MSJ* at 13; *Plaintiffs' MSJ* at 14.

[106] A.R. 3493; *Defendants' MSJ* at 13; *Plaintiffs' MSJ* at 14.

[107] *Plaintiffs' MSJ* at 14; *Defendants' MSJ* at 13; A.R. 5346–64.

grounds.[108]  Contrary to UBH's determination that Maple Lake was a boarding school, he

asserted it was a licensed residential treatment facility.[109]  H.R. noted UBH did not provide him

with the criteria used to make its medical necessity determination, as requested in his level one

appeal.[110]  He expressed concern that "UBH's shifting denial rationale shows a willful disregard

of [its] ERISA duty to provide us with a full and fair opportunity to engage in a good faith

discussion of denied claims."[111]

H.R. then addressed the medical necessity of D.R.'s treatment at the intermediate

inpatient level of care.[112]  He provided a copy of D.R.'s medical records, including all records

from Maple Lake up to D.R.'s discharge on October 4, 2018.[113]  The appeal letter included

numerous quotations from the Maple Lake records purporting to demonstrate "intermediate

behavioral health treatment was medically necessary."[114]  The selected records document

instances of threats and acts of physical violence, self-harming behavior, suicidal ideation,

defiant behavior, stealing and bullying, and at least one occasion in which D.R. was placed on

suicide watch.[115]

---

[108] A.R. 5347; *Plaintiffs' MSJ* at 14–15.

[109] A.R. 5347; *Plaintiffs' MSJ* at 15.

[110] A.R. 5347; *Plaintiffs' MSJ* at 15.

[111] A.R. 5347; *Plaintiffs' MSJ* at 15.

[112] A.R. 5348; *Plaintiffs' MSJ* at 15.

[113] A.R. 5348; *Plaintiffs' MSJ* at 15.

[114] A.R. 5348; *Plaintiffs' MSJ* at 15.

[115] A.R. 5349–59; *Plaintiffs' MSJ* at 15.  Defendants' do not dispute the accuracy of the quoted records but dispute Plaintiffs' "argumentative summaries of [the] second-level appeal letter" and the letter's selective citation of D.R's Maple Lake medical records.  *Defendants' Opposition* at 8–9.  As will be explained more below, the relevance of the medial record quotations is simply that they were in the appeal letter for UBH's consideration.  By referencing the contents of the appeal letter here, the court does not suggest the letter provides a comprehensive summary of D.R.'s medical records.

In conclusion, H.R. asserted the medical records demonstrate D.R. required care in a "24-hour residential setting to remain safe."[116]  He reiterated Maple Lake operated as a licensed residential treatment center for adolescents with mental and behavioral health problems, and requested UBH provide him with all governing Plan documents should the denial be upheld.[117]

UBH upheld the denial for lack of medical necessity on February 8, 2019 in a written letter issued by Dr. Sherifa Iqbal, a UBH Medical Director board-certified in psychiatry and neurology psychiatry.[118]  Iqbal wrote:

> The noncoverage determination for residential level of care will be upheld on 8/18/2017 and forward.  This is based on Optum Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines.  Your child was being treated for chronic, oppositional behaviors.  He was not wanting to harm himself or others.  He was often responsive to redirection.  He was eating and sleeping well.  It appears that his chronic behaviors could have been addressed in a less intensive setting with individual and family therapy, as well as medication management.[119]

### iv.   External Review

On March 18, 2019, H.R. submitted a written request for an independent external review of UBH's final adverse appeal determination.[120]  In his request, H.R. expressed concern that "UBH's denial letter did not describe any clinical evidence based on [D.R.]'s medical records or include any other explanatory documents to support the reasoning provided."[121]  H.R. again included D.R.'s medical records and argued D.R.'s treatment was medically necessary based on

---

[116] A.R. 5362.

[117] A.R. 5362–64; *Plaintiffs' MSJ* at 16.

[118] *Defendants' MSJ* at 13; *Plaintiffs' MSJ* at 16; A.R. 5306–07.

[119] A.R. 5306; *Defendants' MSJ* at 13–14; *Plaintiffs' MSJ* at 16.

[120] *Plaintiffs' MSJ* at 16; *Defendants' MSJ* at 14; A.R. 5319.

[121] A.R. 5322; *Plaintiffs' MSJ* at 16.

the opinions of his various treating professionals.[122]  He noted UBH's denials seemed to apply criteria that was inconsistent with the LOC Guidelines for sub-acute RTC care.[123]  For example, UBH justified the denial by stating D.R. did not want to harm himself or others but, as H.R. explained, those symptoms pertain to the necessity of acute level care.[124]  The LOC Guidelines for Residential Treatment expressly state the RTC level of care is medically necessary when "[t]he member is not in imminent or current risk of harm to self, others, and/or property."[125]

UBH referred H.R.'s request for an independent external review, along with all supporting documentation and information utilized by UBH in reaching its adverse benefit determination, to AllMed Healthcare Management, an independent external review agency.[126]  On July 1, 2019, AllMed issued a written letter notifying H.R. it was upholding UBH's denial of benefits because D.R.'s treatment at Maple Lake "was not medically necessary based on the applicable benefit plan language."[127]  The letter included several staff notes from D.R.'s Maple Lake medical records.[128]  Some reflected instances where D.R. "had seemed to improve,"[129] "was doing better with following staff direction,"[130] and "denied any [suicidal ideation], [self-harm], and [homicidal ideation]."[131]  However, others noted D.R. exhibited "unsafe

---

[122] A.R. 5323; *Plaintiffs' MSJ* at 17.

[123] A.R. 5323–24; *Plaintiffs' MSJ* at 17.

[124] A.R. 5323–24; *Plaintiffs' MSJ* at 17.

[125] A.R. 5323–24; *Plaintiffs' MSJ* at 17.

[126] *Defendants' MSJ* at 14.

[127] A.R. 7252, 7256; *Plaintiffs' MSJ* at 18; *Defendants' MSJ* at 14.

[128] A.R. 7253–56.

[129] A.R. 7254.

[130] *Id.*

[131] *Id.* 7253–55.

behaviors,"[132] "had some blow ups,"[133] "wrote a note showing that he had been having [suicidal ideations],"[134] "made himself vomit,"[135] and several instances in which he was placed on close observational status.[136]

After providing excerpts from D.R.'s Maple Lake records, AllMed explained its rationale for upholding UBH's denial:

> The patient is diagnosed with autism spectrum disorder, oppositional defiant disorder, major depressive disorder, and attention-deficit hyperactivity disorder. For the dates in question, the patient was not actively suicidal, homicidal, or gravely impaired for self-care. There was no report of self-harm. There was no report of auditory or visual hallucinations. The patient's chronic oppositional behaviors seemed to be at baseline status, and there is no reasonable expectation that his condition would further improve with continued treatment at this level of care.[137]

The reviewer set forth the Plan's medical necessity criteria and stated D.R's treatment failed to meet the criteria because it was not "[c]lincially appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your sickness . . . mental illness . . . disease or its symptoms."[138] The claim also failed to meet the medical necessity criteria requiring treatment to be "[n]ot more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results . . . ."[139] The review concluded D.R. "did not require residential level of care. His chronic, oppositional behaviors could have been safely treated in a less intensive setting. The patient could have been safely

---

[132] *Id.* 7252.

[133] *Id.* 7254.

[134] *Id.*

[135] *Id.* 7255.

[136] *Id.* 7253, 7254, 7255.

[137] *Id.* 7256; *Plaintiffs' MSJ* at 18; *Defendants' MSJ* at 14.

[138] A.R. 7256; *Plaintiffs' MSJ* at 18; *Defendants' MSJ* at 14.

[139] A.R. 7256; *Plaintiffs' MSJ* at 18; *Defendants' MSJ* at 14.

treated in a lower level of care with individual and family therapy, along with medication management."[140]

## 5. The Present Litigation

After exhausting their internal administrative appeals as required under the Plan and ERISA, Plaintiffs filed this action on June 22, 2021 asserting three causes of action.[141]  First, Plaintiffs seek recovery of Plan benefits under 29 U.S.C. § 1132(a)(1)(B), arguing UBH and the Plan breached fiduciary duties in denying benefits for D.R.'s medically necessary treatment at Second Nature and Maple Lake.[142]  Second, Plaintiffs seek "appropriate equitable" relief under the Parity Act, 29 U.S.C. § 1132(a)(3), asserting UBH imposed more stringent limitations on intermediate mental health benefits than it does for analogous medical and surgical benefits.[143]  Third, Plaintiffs request statutory penalties under 29 U.S.C. § 1132(a)(1)(A) and (c), contending UBH and the plan administrator failed to produce documents under which the Plan was operated within 30 days of Plaintiffs requesting them.[144]  Plaintiffs also request an award of prejudgment interest, attorney fees, and costs pursuant to 29 U.S.C. § 1132(g).[145]

After engaging in discovery, the parties filed cross-motions for summary judgment in December 2023.[146]  In their Motion, Plaintiffs first ask the court to reverse Defendants' denial of Plan benefits for D.R.'s residential treatment, arguing the decisions were arbitrary and

---

[140] A.R. 7256–57; *Plaintiffs' MSJ* at 18; *Defendants' MSJ* at 14.

[141] Dkt. 2, *Complaint*.

[142] *Id.* ¶¶ 56–60.

[143] *Id.* ¶¶ 61–79.

[144] *Id.* ¶¶ 80–84.

[145] *Id.* ¶ 85.

[146] Dkts. 69 and 71.

capricious.[147]  Second, Plaintiffs ask the court to find Defendants committed "as-applied" Parity

Act violations in two ways: 1) by requiring D.R. to exhibit acute symptoms to qualify for

residential treatment when sub-acute symptoms are sufficient for coverage of treatment at a

skilled nursing facility (SNF) or inpatient rehabilitation facility (IRF), the Plan's analogous

medical and surgical care, and 2) by denying benefits for D.R.'s treatment at Second Nature

when "by [Defendants'] own classification," Second Nature provides an intermediate level of

care comparable to services provided at an SNF or IRF.[148]  Third, Plaintiffs request the court

impose statutory penalties for Defendants failure to provide Plan documents within 30 days of

Plaintiffs submitting a written request for them.[149]  Lastly, if the court finds in favor of Plaintiffs

on either their denial of benefits claim or their Parity Act claim, they ask the court award benefits

rather than remand their coverage claims back to Defendants.[150]  Plaintiffs request the

opportunity to file additional briefing concerning their entitlement to prejudgment interest,

attorney fees, and costs if the court grants their Motion.[151]

　　　　Defendants' Motion argues they are entitled to judgment as a matter of law on each of

Plaintiffs' claims.  Defendants first argue Plaintiffs are not entitled to an award of benefits under

29 U.S.C. § 1132(a)(1)(B) because D.R.'s treatment was not medically necessary, and its

coverage denial was not arbitrary and capricious.[152]  Broadly, Defendants contend their

determination should be upheld because it was reasonable and supported by substantial

---

[147] *Plaintiffs' MSJ* at 22.

[148] *Id.* at 33.

[149] *Id.* at 36–38.

[150] *Id.* at 38–39.

[151] *Id.* at 39–40.

[152] *Defendants' MSJ* at 15.

evidence—namely, that multiple medical reviewers determined the claim for benefits was not medically necessary.[153]

Second, Defendants assert they are entitled to summary judgment on Plaintiffs' Parity Act claim because Plaintiffs cannot demonstrate Defendants applied more stringent treatment limitations for RTC care than it would for SNF or IRF care.[154]  According to Defendants, they evaluate medical necessity for both RTC and SNF or IRF care by considering evidence-based guidelines, in conjunction with the member's symptoms, to determine the appropriate intensity of services.[155]  Under both guidelines, the member must demonstrate the need for 24-hour care to establish the necessity of inpatient intermediate care.[156]  Defendants assert they did not require acute level symptoms for D.R.'s claims for RTC benefits.[157]

Third, Defendants contend they are entitled to summary judgment on Plaintiffs' claim for statutory penalties because there is no evidence in the record of the request for Plan documents Plaintiffs purportedly sent to the plan administrator in May 2020.[158]  Defendants are not in possession of the letter, Plaintiffs admit they did not keep a copy of it, and all that is in the record is a purportedly identical unsigned, undated draft.[159] Moreover, the address for the plan administrator on the draft letter is incorrect.[160]

---

[153] *Id.* at 16–18.

[154] *Id.* at 26.

[155] *Id.* at 27.

[156] *Id.* at 29.

[157] *Id.*

[158] *Id.* at 38.

[159] *Id.*

[160] *Id.* at 39.

Lastly, Defendants argue Plaintiffs are not entitled to attorney fees or prejudgment interest and assert, if the court finds an abuse of discretion, Plaintiffs' claim for benefits should be remanded to Defendants for further review.[161]

The parties' Motions are fully briefed and ripe for review.[162]

## II.   LEGAL STANDARD

Summary judgment is appropriate if the moving party establishes "there is no genuine issue as to any material fact" and it is "entitled to judgment as a matter of law."[163]   Typically, courts "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[164]   However, in an ERISA case where both sides move for summary judgment, they have effectively "stipulated that no trial is necessary" and "summary judgment is merely a vehicle for deciding the case."[165]   In deciding a denial of benefits claim, "the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[166]

---

[161] *Id.* at 39–40.

[162] The court determines oral argument would not materially assist its resolution of the parties' Motions.  It makes its findings based on careful review of the parties' briefs and other records submitted to the court.  *See Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th Cir. 1988) (holding a hearing on a summary judgment motion "is not necessarily required" and "the parties' right to be heard may be fulfilled by the court's review of the briefs and supporting affidavits and materials submitted to the court") (citation omitted).

[163] Fed. R. Civ. P. 56(a).

[164] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[165] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted).

[166] *Id.* (citation omitted).

### III.    ANALYSIS

Plaintiffs assert three causes of action: 1) a claim for recovery of benefits under ERISA, 2) a claim for violation of the Parity Act, and 3) a claim for statutory penalties.  Both parties moved for summary judgment on all claims.  The court addresses each claim in turn.

### A.   Denial of Benefits Claim

The court will first outline the standard of review applicable to Plaintiffs' claim challenging Defendants' denial of benefits under § 1132(a)(1)(B).  It will then address the merits before turning to the appropriate remedy.

### 1.   Standard of Review

ERISA permits plan participants, like Plaintiffs here, to bring "a judicial action challenging an administrative denial of benefits but does not specify the standard of review that courts should apply."[167]  The Supreme Court has clarified de novo review applies "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[168]  When the plan affords this discretion, courts typically "employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[169]

The parties agree arbitrary and capricious is the appropriate standard of review for Plaintiffs' denial of benefits claim.[170]  "Under arbitrary and capricious review, the actions of

---

[167] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009).

[168] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[169] *LaAsmar*, 605 F.3d at 796 (quoting *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)).

[170] *See Plaintiffs' MSJ* at 22 ("Following the reasoning of *D.K.* and *David P.*, the decision to deny benefits must be reversed as arbitrary and capricious."); *Defendants' MSJ* at 15–16.

ERISA administrators are upheld if reasonable and supported by substantial evidence."[171]

Substantial evidence means "such evidence that a reasonable mind might accept as adequate to

support the conclusion reached by the decision-maker."[172]  This "requires more than a scintilla

but less than a preponderance."[173]  The court is not required to "determine the [administrator's]

interpretation was the only logical one, nor even the best one.  Instead, the decision will be

upheld unless it is not grounded [on] any reasonable basis."[174]  This deferential standard does not

mean review is "without meaning."[175]  "In determining whether the evidence in support of the

administrator's decision is substantial, [the court] must take into account whatever in the record

fairly detracts from its weight."[176]

## 2.   Arbitrary and Capricious Denial of Plan Benefits

Plaintiffs argue Defendants' denial of benefits should be reversed because Defendants

failed to engage with the opinions of D.R.'s treating professionals and did not provide reasoned

analysis with citations to D.R.'s medical records.[177]  Defendants counter the denials were not

arbitrary and capricious because they were reasonable and based on substantial evidence in the

---

[171] *D.K. v. United Behav. Health*, 67 F.4th 1224, 1235 (10th Cir. 2023) (citing *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006)).

[172] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1308 (10th Cir. 2023) (quoting *Graham v. Hartford Life & Acc. Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009)).

[173] *Id.*

[174] *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (citations and internal quotations omitted), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

[175] *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 F. App'x 697, 705 (10th Cir. 2018) (unpublished).  Though unpublished, *McMillan* is frequently cited by courts in the District of Utah and this statement is consistent with the Tenth Circuit's subsequent holdings in *D.K.* and *David P.  See, e.g., Theo M.*, 631 F. Supp. 3d at 1101; *Kerry W. v. Anthem Blue Cross & Blue Shield*, 444 F. Supp. 3d 1305, 1312 (D. Utah 2020).

[176] *David P.*, 77 F.4th at 1308 (quoting *Graham*, 589 F.3d at 1358).

[177] *Plaintiffs' MSJ* at 21.

administrative record.[178]  The court first provides a brief overview of the relevant provisions of ERISA governing claims processing by plan administrators before separately evaluating Defendants' denials for Second Nature and Maple Lake.  The court finds these denials do not meet the standards ERISA requires, as recently articulated by the Tenth Circuit in *D.K.* and *David P.*, and fail arbitrary and capricious review.

"ERISA imposes 'a special standard of care upon a plan administrator.'"[179]  The administrator, acting as a fiduciary, "must discharge its duties with respect to discretionary claims decisions solely in the interest of the participants and beneficiaries of the plan . . . and, consistent with this standard of care, must provide a full and fair review of claim denials."[180]

In accordance with this requirement, the Department of Labor's implementing regulations require administrators to "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim."[181]  Administrators must set forth "specific reason[s]" for denials of benefits that "apply . . . the terms of the plan to the claimant's medical circumstances."[182]  For the claimant, ERISA's full and fair review "means 'knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his

---

[178] *Defendants' Opposition* at 16; *Defendants' MSJ* at 18.

[179] *McMillan*, 746 F. App'x at 705 (quoting *Metro. Life Ins. Co.*, 554 U.S. at 115).

[180] *Raymond M. v. Beacon Health Options, Inc.*, 463 F. Supp. 3d 1250, 1266 (10th Cir. 2020) (internal citations and quotations omitted).  *See also* 29 U.S.C. § 1133(2) (requiring "every employee benefit plan . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim").

[181] 29 C.F.R. § 2560.503-1(h)(2)(iv).

[182] *Id.* § 2560.503-1(g)(1)(i), (v).

decision.'"[183]  Fundamentally, ERISA and its implementing regulations require "a meaningful dialogue between ERISA plan administrators and their beneficiaries . . . . There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters."[184]

The meaningful dialogue ERISA mandates does not require plan administrators defer to the evidence claimants provide, including the opinions of treating caregivers.[185]  However, "a reviewer may not arbitrarily refuse to credit opinions if they constitute reliable evidence from the claimant."[186]  Claimants frequently support their benefits claims with medical opinions and reviewers "cannot shut their eyes to readily available information . . . [that may] confirm the beneficiary's theory of entitlement."[187]  If Defendants "arbitrarily refused to credit and effectively 'shut their eyes' to the medical opinions of [D.R.'s] treating physicians, [they] acted arbitrarily and capriciously."[188]

### a.  Defendants' Second Nature Denial Was Arbitrary and Capricious

Defendants' denial of benefits for D.R.'s treatment at Second Nature was arbitrary and capricious because Defendants failed to meaningfully engage with the evidence Plaintiffs provided to support their claim and did not adequately explain the bases for Defendants' determinations.

---

[183] *David P.*, 77 F.4th at 1300 (quoting *Sage v. Automation, Inc. Pension Plan & Tr.*, 845 F.2d 885, 893–94 (10th Cir. 1988)).

[184] *Id.* (quoting *Rasenack ex rel. Tribolet*, 585 F.3d at 1326).

[185] *David P.*, 77 F.4th at 1310 (quoting *D.K.*, 67 F.4th at 1237).

[186] *D.K.*, 67 F.4th at 1237.

[187] *Id.* (quoting *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004)).

[188] *Id.*

Plaintiffs argue D.R.'s admission and treatment at Second Nature was medically necessary based on the recommendations of his treating providers who concluded care at lower levels was insufficient.[189]  For example, Asay detailed his lengthy treatment history with D.R., noting the "significant changes in his behavior," the challenges presented by his behavioral problems, and D.R's parents' fear "of being physically hurt by him."[190]  He recommended Plaintiffs "should consider placement in a more structured, intensive treatment environment, such as a residential treatment program."[191]  Similarly, Ekobena, another of D.R.'s treatment providers, noted "[p]rogress was not being made with an outpatient treatment and he was quickly declining."[192]  Due to D.R.'s continuing "oppositional and defiant behaviors," she recommended "his family place him in an inpatient program for troubled teenagers."[193]  While D.R. was at Second Nature, Corelli conducted an extensive psychological evaluation and recommended, in view of D.R.'s many mental and behavioral health issues, he be placed in "a longer-term residential treatment program that can continue addressing each of these issues in depth."[194]

Although Plaintiffs presented these records and others at each level of appeal, Defendants repeatedly failed to meaningfully engage with them and shifted the rationale for their denials. Defendants initially denied Plaintiffs' claim for benefits because Defendants "determined [Second Nature's] wilderness therapy program to be an experimental or unproven treatment" not covered by the Plan.[195]  The notification further states D.R. "could have received treatment for

---

[189] *Plaintiffs' MSJ* at 24.

[190] *Id.*; A.R. 7387.

[191] *Plaintiffs' MSJ* at 24.; A.R. 7387.

[192] *Plaintiffs' MSJ* at 25; A.R. 7388.

[193] *Plaintiffs' MSJ* at 25; A.R. 7388.

[194] *Plaintiffs' MSJ* at 25; A.R. 8072–73.

[195] A.R. 659; *Defendants' MSJ* at 18.

his condition with Intensive Outpatient services," suggesting Defendants' also based the denial on a lack of medical necessity.[196]  However, this single conclusory sentence provides no explanation for how or why Defendants reached that determination.

Defendants' level one appeal decision upholding the denial reiterated Second Nature did not qualify as an RTC under the Plan and offered more detail for Defendants' medical necessity determination.  However, it fails to acknowledge the countervailing evidence provided by Plaintiffs or explain why Defendants did not credit it.  Defendants simply concluded D.R.'s "condition appeared to be stabilized to the extent that he did not require a facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to prevent harm to himself or others."[197]  Despite evidence to the contrary, Defendants stated D.R. was,

> Not self-harming or aggressive towards others.  He was not an imminent danger of harm to self or others.  The member was cooperative, responsive to staff, medication adherent, and doing better.  He had no reported behavioral problems and was cooperative with care . . . . He continued to have baseline impulsivity and reactivity related to his diagnoses of ADHD and ODD, and he was also newly assessed as having ASD with social impairments . . . . There were no clinical barriers preventing the member from transitioning to a less intensive level of care.[198]

Defendants' level two appeal determination appears to uphold the earlier denial solely on the basis that Second Nature did not meet the Plan's requirements for residential mental health treatment.[199]  "Namely, there was no initial nor ongoing assessment by a psychiatrist during your

---

[196] A.R. 659.

[197] A.R. 1207–08.

[198] A.R. 1208.

[199] A.R. 1923.

son's treatment episode."[200]  Defendants seem to abandon their previous medical necessity

determination and, in fact, depart from the prior determination that D.R. did not require RTC-

level care.  The reviewer states his decision "does not mean that [D.R.] could not have received

treatment.  Instead, he could have received care in a mental health residential treatment setting

that met the Optum guidelines for mental health residential treatment."[201]

The court concludes Defendants' communications concerning Plaintiffs' Second Nature

claim for benefits each exhibit similar deficiencies under ERISA.  Defendants' Motion focuses

exclusively on the portions of the denial and appeal letters addressing Second Nature's failure to

meet the criteria for a covered RTC under the Plan.  Were this the only rationale asserted for the

denial of Plaintiffs' claim, that determination may have been reasonable and supported by

substantial evidence.  However, that was not the only basis Defendants provided.  The

communications also address medical necessity.  At least in the initial denial and the first level

appeal, Defendants determined D.R. did not require inpatient care in an RTC and could have

received care at a lower level.  These portions of Defendants' communications are deficient

under ERISA.

When a denial is based on medical necessity, administrators must provide "an

explanation of the scientific or clinical judgment for the determination, applying the terms of the

plan to the claimant's medical circumstances."[202]  Defendants statement that D.R. "could have

received treatment for his condition with Intensive Outpatient services,"[203] does not do this.

Then, when Plaintiffs appealed that determination and provided evidence supporting the

---

[200] *Id.*

[201] *Id.*

[202] 29 C.F.R. § 2560.503-1(g)(1)(v)(B).

[203] A.R. 659.

necessity of inpatient care at an RTC—including the opinions of multiple treatment providers—Defendants did not acknowledge these opinions and explain why they disagreed.  They provided only a series of conclusory assertions about D.R.'s condition without citation to any evidence in the administrative record supporting those conclusions.

ERISA's full and fair review requires more.  Defendants did not have to agree with the opinions of D.R.'s treatment providers but they could not ignore them.  The Tenth Circuit has made clear that "[b]y simply ignoring the treating care giver opinions, after [Plaintiffs] specifically pointed them out, [Defendants] deprived Plaintiffs of the dialogue ERISA requires between plan administrators and benefits claimants, which is necessary for the statutorily-required 'full and fair' administrative review."[204]  By not providing an explanation for rejecting the multiple opinions Plaintiffs offered to support their claim, Defendants "effectively 'shut [their] eyes' to readily available medical information" and acted arbitrarily and capriciously.[205]

The fact Defendants' level two appeal decision acknowledged without explanation that D.R. could have received inpatient treatment at a qualifying RTC does not absolve these deficiencies.  In fact, it underscores the arbitrariness of Defendants' determinations.[206]  When Defendants' own reviewers come to inconsistent conclusions and fail to provide any explanation for the shift in rationale, it is unclear how these determinations offer any clarifying information to Plaintiffs or could be anything but arbitrary and capricious.  One purpose of ERISA's full and

---

[204] *David P.*, 77 F.4th at 1311.

[205] *D.K.*, 67 F.4th at 1237 (holding UBH acted arbitrarily and capriciously "[b]y not providing an explanation for rejecting or not following" the opinions of three treatment providers recommending plaintiff required care in an RTC).

[206] The arbitrariness is further emphasized by Defendants' denial of RTC benefits at Maple Lake, discussed below. D.R. was admitted to Maple Lake two days after he left Second Nature.  Despite informing Plaintiffs D.R. could receive care at a qualified RTC, Defendants then denied benefits at Maple Lake due to lack of medical necessity.

fair review is the "consistent treatment of claims."[207]  Defendants' inconsistency here—particularly in view of Defendants' subsequent denial of D.R.'s residential treatment at Maple Lake for lack of medical necessity—does not advance this objective, nor does it suggest to the court their determinations were "made on a reasoned basis."[208]  Accordingly, Defendants' denial of benefits for Plaintiffs' treatment at Second Nature is reversed.[209]

### b.  Defendants' Maple Lake Denial was Arbitrary and Capricious

Defendants' denial of Plan benefits for D.R.'s treatment at Maple Lake was also arbitrary and capricious.  Defendants' communication with Plaintiffs from the initial claim denial through the appeals process suffered from the same fatal defects as the Second Nature denial.  At each step of the process, Defendants deprived Plaintiffs of the full and fair review ERISA requires by failing to meaningfully engage with the evidence Plaintiffs provided and not offering reasoned explanations for Defendants' decisions.

---

[207] *Spradley v. Owens-Ill. Hourly Emps. Welfare Ben. Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (internal citation and quotations omitted).

[208] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

[209] Given that Defendants appear to have abandoned the medical necessity rationale supporting the denial, the court acknowledges there may, at first glance, appear to be some tension with its determination on this issue.  However, in evaluating whether Defendants provided the full and fair review ERISA requires, the court does not consider each communication in a vacuum.  Rather, it adjudges whether Defendants' decisions resulted from a "reasoned and principled process" and are "consistent with any prior interpretations by the plan administrator."  *D.K.*, 67 F.4th at 1236.  Had Defendants denied benefits for Second Nature solely on the grounds that the facility did not qualify as an RTC, and not discussed medical necessity at all, the determination may have been supported by substantial evidence in the record.  Instead, Defendants also communicated inconsistent and inadequate medical necessity determinations to Plaintiffs.  And then, after ultimately concluding D.R. could have received inpatient treatment at a qualifying RTC, compounded the inconsistency by denying on medical necessity grounds Plaintiffs' claim for benefits at the RTC he was admitted to two days after leaving Second Nature.  The totality of the circumstances illustrates the arbitrary and capriciousness of Defendants' review process and demonstrates the consequences of depriving Plaintiffs of the meaningful dialogue ERISA requires.  Absent a reasoned and principled process that consistently interpreted and applied provisions of the Plan, Plaintiffs were left unable to understand why their claims were denied and to make informed decisions about D.R.'s care moving forward.

Plaintiffs' level one appeal letter included the same records and medical opinions Plaintiffs previously submitted in support of the Second Nature claim.[210]  Defendants' level one appeal decision did not engage with any of this information.  Instead, Defendants upheld the initial denial because Maple Lake "did not provide the scope or intensity of services that would meet the definition of a clinical residential treatment center, such as the regular use of a multidisciplinary team including independently licensed clinicians such as psychologists, psychiatrists, pediatricians, and licensed therapists who are constantly involved in the care of the individual."[211]  The reviewer concluded "[e]vidence based mental health care was available in your community."[212]

In their level two appeal, Plaintiffs again submitted D.R.'s records, this time supplemented with records from his treatment at Maple Lake.[213]  As detailed in the factual background above, the letter included numerous pages of treatment notes demonstrating instances in which D.R. had suicidal ideations, violent interactions with others, engaged in self-harm, and made threats to harm himself or others.[214]  Notwithstanding Plaintiffs' extensive documentation, Defendants upheld their denial in a few conclusory sentences:

> The noncoverage determination for residential level of care will be upheld on 8/18/2017 and forward.  This is based on Optum Level of Care Guidelines for Residential Treatment of Mental Health Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines.  Your child was being treated for chronic, oppositional behaviors.  He was not wanting to harm himself or others.  He was often responsive to redirection.  He was eating and sleeping well.  It appears that his chronic behaviors could have been addressed in a

---

[210] A.R. 2018–25.

[211] A.R. 3492–93.

[212] A.R. 3493.

[213] A.R. 5346–64.

[214] A.R. 5348–61.

less intensive setting with individual and family therapy, as well as medication management.[215]

The reviewer's determination was directly contradicted by evidence Plaintiffs provided in their appeal letter, as well as other evidence in the administrative record.  Despite that, the reviewer did not engage with Plaintiffs' evidence and did not explain why, in view of that evidence, Defendants chose not to credit it.  Nor did the reviewer cite to countervailing record evidence supporting the conclusions reached.[216]

After Defendants issued the level two appeal decision, Plaintiffs requested an independent external review.[217]  The external reviewer upheld the denial based on lack of medical necessity but, like each of the others, the explanation provided was inadequate.  Unlike the others, this decision at least selectively quoted staff notes from D.R.'s Maple Lake treatment records.[218]  The records quoted included some in which staff noted D.R. was doing well and denied any suicidal ideations, homicidal ideations, or self-harm.[219]  However, some of the records discussed instances where D.R. "made himself vomit," had "blow ups," exhibited "unsafe behaviors," and was placed on close observational status.[220]

Despite this, the external reviewer concluded residential treatment was not medically necessary.[221]  The rationale stated:

> The patient is diagnosed with autism spectrum disorder, oppositional defiant disorder, major depressive disorder, and attention-deficit hyperactivity disorder.

---

[215] A.R. 5337.

[216] The level two appeal decision appears to have abandoned the rationale provided for upholding the denial in the level one appeal decision—that Maple Lake did not meet the Plan's criteria for RTCs.

[217] *Defendants' MSJ* at 21.

[218] A.R. 7253–56.

[219] *See id.* 7255.

[220] *See id.* 7253–55.

[221] *Id.* 7256.

> For the dates in question, the patient was not actively suicidal, homicidal, or gravely impaired for self-care. There was no report of self-harm. There was no report of auditory or visual hallucinations. The patient's chronic oppositional behaviors seemed to be at baseline status, and there is no reasonable expectation that his condition would further improve with continued treatment at this level of care.[222]

Not only are these conclusory determinations contradicted by evidence in the administrative record the reviewer did not cite, but some are also directly contradicted by the records the reviewer does cite. Notwithstanding, the reviewer provides no explanation for why that evidence was disregarded.[223]

Just as with Second Nature, Defendants' explanations for their denial and appeal determinations concerning Maple Lake fall far short of ERISA's full and fair review requirements. Defendants at no point discuss, or even acknowledge, the record evidence contradicting their determinations. Again, Defendants "were not required to defer to the treating physician opinions provided. However, their duties under ERISA require them to address medical opinions, particularly those which may contradict their findings."[224] "This," the Tenth Circuit explains, "is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence from medical opinions, the reviewer must respond to the opinions."[225] In view of Defendants' complete failure to engage with the opinions and evidence Plaintiffs provided, the court must conclude Defendants "shut [their] eyes to readily available

---

[222] *Id.*

[223] Even if the external reviewer's decision had complied with ERISA's requirements in upholding Defendants' denial, this likely would not cure the defects in the internal claims processing and appeal process. *See David P.*, 77 F.4th at 1314 (affirming district court's reversal of UBH's claim denial where it abused its discretion by "inadequately processing Plaintiffs' claims" and holding an external reviewer's decision "cannot cure UBH's deficient claims processing").

[224] *D.K.*, 67 F.4th at 1241.

[225] *Id.*

medical information," and its denial of benefits for D.R.'s Maple Lake treatment was arbitrary and capricious.[226]

Defendants provide several arguments why the denial was reasonable and supported by substantial evidence in the administrative record, none of which are compelling.[227] First, Defendants state "[c]ourts have consistently upheld adverse benefits determinations under facts similar to those in this case," and cite several cases where denials for RTC care were upheld due to lack of medical necessity.[228] The court has no doubt there are cases in which denials are reasonable and supported. Indeed, a denial would be appropriate if the evidence in the administrative record demonstrated a lack of medical necessity and the administrator adequately explained that. Even in cases with conflicting evidence, if plan administrators adequately explain why they choose to discredit or discount certain evidence in making their determination, a denial will often be defensible under the arbitrary and capricious standard of review. But that is not this case. Defendants never acknowledged or engaged with evidence Plaintiffs provided which contradicted Defendants' determination. The fact other courts considering other facts came to different conclusions has no relevance to this case.

Next, Defendants contend "where multiple reviewers have all independently determined that requested RTC healthcare services are not medically necessary, as occurred here, those determinations are supported under either a *de novo* or arbitrary and capricious standard of review."[229] Defendants cite three cases in support of their argument, none of which the court finds persuasive. In *Tracy O. v. Anthem Blue Cross Life and Health Insurance Company*, the

---

[226] *David P.*, 77 F.4th 1311 (quoting *D.K.*, 67 F.4th at 1237).

[227] *Defendants' MSJ* at 22.

[228] *Id.*

[229] *Id.* at 22.

court acknowledged each reviewer concluded inpatient treatment at an RTC was not medically necessary.[230]  However, unlike this case, these determinations did not contradict the opinions of treating care providers.  Indeed, "none of [plaintiff's] treatment providers offered an opinion that [plaintiff's] symptoms and behaviors represented a deterioration from their usual status" or that "a short term, subacute residential treatment service will have a likely benefit."[231]  With respect to the other two cases Defendants cite—a non-precedential unpublished Tenth Circuit decision and a district court decision—neither expressly supports the position Defendants rely on them for.[232]  Further, in the court's view, aspects of both may be inconsistent with the Tenth Circuit's subsequent holdings in *D.K.* and *David P.*

Moreover, in circumstances consistent with this case, other courts have rejected Defendants' argument that, standing alone, multiple similar determinations by reviewers constitutes substantial evidence a denial was not arbitrary and capricious.  In *Theo M. v. Beacon Health Options*, defendants raised an argument like Defendants' here, asserting their denial was not arbitrary and capricious because external reviewers agreed with their denial decision.[233]  Like here, none of the decisions communicated to plaintiffs engaged with the contrary evidence plaintiffs provided and the court concluded "even '[i]f the reviewers' conclusions were based on 'substantial evidence,' no such evidence is cited in the explanations [defendant] sent to Plaintiffs. The rationales offered by the reviewers fail to adequately explain their conclusions, and [defendant's] denial of coverage was therefore arbitrary and capricious.'"[234]  Directly on-point,

---

[230] No. 2:16-cv-422-DB, 2017 WL 3437672, at *9 (D. Utah Aug. 10, 2017).

[231] *Id.*

[232] *See Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580 (10th Cir. 2019); *Amy G. v. United Healthcare*, No 2:17-cv-00427-BSJ, 2018 WL 2303156 (D. Utah May 21, 2018).

[233] 631 F. Supp. 3d at 1107.

[234] *Id.* (quoting *Kerry W.*, 444 F. Supp. 3d at 1313).

in *S.K. v. United Behavioral Health*, UBH raised the same argument and the court rejected it, finding each level of review "deficient to the point [it was] arbitrary and capricious."[235]  The court noted "[h]aving three deficient denials considered together does not amount to substantial evidence to save any one of them."[236]  The same conclusion follows here.  Multiple levels of deficient arbitrary and capricious determinations do not add up to a full and fair review.

Lastly, Defendants argue the Tenth Circuit's decisions in *D.K.* and *David P.* "are inapposite because the fact-specific conclusions . . . regarding the administrative review process and procedural errors in those cases do not support a finding of abuse of discretion here."[237]  Defendants assert the cases are distinguishable because of the "complex" needs of the plaintiff in *D.K.* and because in *David P.,* the claims administrator did not address one of the plaintiff's grounds for seeking treatment.[238]  Again, these arguments are unpersuasive.

The court does not read the holdings of *D.K.* and *David P.* to be limited to the facts of those cases.  Rather, the relevant portions of the opinions provide broad guidance concerning what ERISA's full and fair review requires.  In *D.K.*, the Tenth Circuit repeatedly states a reviewer's "duties under ERISA require them to address medical opinions, particularly those which may contradict their findings."[239]  Indeed, the Circuit held, "[t]his is the core of meaningful dialogue: if benefits are denied and the claimant provides potential counterevidence

---

[235] 2023 WL 7221013, at *33.

[236] *Id.*

[237] *Defendants' MSJ* at 23.

[238] *Id.*  The court observes Defendants' argument concerning *David P.* is incomplete, if not misleading.  The plan administrator's failure to consider one of the conditions the plaintiff in that case sought treatment for was only one of the grounds on which the court determined denial was arbitrary and capricious.  *See David P.*, 77 F.4th at 1309–10.  The denials were also found to be arbitrary and capricious due to their failure to provide a full and fair review.  *Id.* at 1310–13.  Just as here, defendants failed to engage with the evidence submitted by plaintiffs and did not adequately explain the bases for its determination that RTC care was not medically necessary.

[239] *D.K.*, 67 F.4th at 1241.

from medical opinions, the reviewer must respond to the opinions."[240]  Nothing in the opinion suggests the Circuit intended its holdings to be limited to the facts of *D.K.*

*David P.* offers similarly broad guidance concerning the requirements of a full and fair review.  In fact, the opinion itself undermines Defendants' argument that these are fact-specific decisions.  The central holdings of *David P.* primarily rely upon and extensively quote *D.K.*  In affirming the district court's reversal of a denial of benefits under arbitrary and capricious review, the Circuit stated "[p]lan administrators 'cannot shut their eyes to readily available information . . . [that may] confirm the beneficiary's theory of entitlement.'"[241]  It further affirmed explanations "'may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record' before the administrator."[242]  The opinion makes clear where plan administrators "shut their eyes to readily available information"[243] by failing to engage with evidence in the administrative record, and instead offer "conclusory" decisions "not 'backed up with reasoning and citations to the record,'" their denials are arbitrary and capricious.[244]

Far from being narrowly confined to the specific facts in the respective cases, *D.K.* and *David P.* broadly interpret the duties ERISA imposes on plan administrators when processing claims and providing a full and fair review.  The relevant facts underlying both decisions had little to do with the particular plaintiffs in the case.  The facts material to the holdings concerned

---

[240] *Id.*

[241] *David P.*, 77 F4th at 1312 (quoting *D.K.*, 67 F.4th at 1237).

[242] *Id.* (quoting *D.K.*, 67 F.4th at 1242).

[243] *Id.* (quoting *D.K.*, 67 F.4th at 1237).

[244] *Id.* at 1313 (quoting *D.K.*, 67 F.4th at 1242).

the defendants' conduct and their failure to comport with ERISA's requirements.  As such, both cases are applicable here and largely control the outcome.

In sum, the court concludes Defendants' denial of benefits for D.R.'s treatment at Maple Lake was arbitrary and capricious.  In denying Plaintiffs' claim, and upholding the denial on multiple levels of appeal, Defendants "shut their eyes" to the evidence Plaintiffs provided which may have supported the medical necessity of D.R.'s treatment.  Defendants did not acknowledge the contrary evidence in the administrative record, nor explain why they ultimately disagreed and chose to discredit it.  All Defendants offered in support of their denial decision were conclusory statements "not backed up with reasoning and citations to the record."[245]  Defendants' failure to engage in a meaningful dialogue with Plaintiffs deprived them of the full and fair review ERISA requires.  Due to their failures, the court cannot conclude Defendants' determinations were reasonable and supported by substantial evidence.  Accordingly, Defendants' denial of benefits for D.R.'s treatment at Maple Lake, much like Second Nature, was arbitrary and capricious and is reversed.

### 3.  Remedy

Having reversed Defendants' denial of Plan benefits for D.R.'s treatment at both Second Nature and Maple Lake, the court must now determine whether to award Plaintiffs coverage for D.R.'s benefits or remand for further administrative review.  Plaintiffs argue the court should award them benefits outright because the medical records show D.R. was entitled to coverage for the care he received, and remand provides Defendants an unfair second bite at the apple.[246]

---

[245] *David P.*, 77 F.4th at 1313.

[246] *Plaintiffs' MSJ* at 38.

Defendants contend remand for further review and reconsideration is the appropriate remedy.[247] The court agrees.

When the court concludes a plan administrator's denial of benefits was arbitrary and capricious, it "may either remand the case to the plan administrator for a renewed evaluation of the claimant's case or [it] may order an award of benefits."[248]  Typically, "[r]emand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision."[249]  However, "if the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate."[250]

In *David P.*, the Tenth Circuit held that in circumstances like those here, remand is the appropriate remedy.  In that case, the Circuit explained UBH did not consider all the evidence before it, did not adequately explain the bases for its denials, and did not otherwise engage with plaintiffs as required.[251]  "Therefore, the most appropriate remedy is to remand Plaintiffs' claims to UBH for its further, and proper, consideration."[252]  This conclusion was further supported by the fact the Court could not "say that the 'record clearly shows' Plaintiffs are entitled to benefits, nor can we say that Plaintiffs are clearly not entitled to the claimed benefits."[253]  The same determination is warranted here.

---

[247] *Defendants' MSJ* at 40.

[248] *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (quoting *Flinders*, 491 F.3d at 1194).

[249] *David P.*, 77 F.4th at 1315 (quoting *Carlile v. Reliance Standard Life Ins. Co.*, 451 F.3d 1217, 1229 (10th Cir. 2021)) (internal quotations omitted).

[250] *Id.* (quoting *Weber*, 541 F.3d at 1015).

[251] *Id.*

[252] *Id.* (citing *Carlile*, 988 F.3d at 1229).

[253] *Id.* (quoting *Carlile*, 988 F.3d at 1229).

The court reverses Defendants' denial of Plan benefits because they failed to consider all the evidence Plaintiffs provided, failed to adequately explain the rationale for their denials, and failed to meaningfully engage with Plaintiffs.  In considering the record before it, the court cannot conclusively say Plaintiffs are clearly entitled to benefits, nor can it determine they are clearly not.  Accordingly, remand to Defendants to conduct a proper review is the appropriate remedy.

Importantly, this remand does not "'provide the plan administrator the opportunity to reevaluate a claim based on a rationale not raised in the administrative record' and not previously conveyed to Plaintiffs."[254]  Concerning Plaintiffs' Second Nature claim for benefits, Defendants may consider whether Second Nature met the Plan criteria for a covered RTC.[255]  Concerning the benefits claim for Maple Lake, since Defendants abandoned their initial rationale, Defendants may only consider whether D.R.'s treatment was medically necessary.

### B.  Parity Act Claim

Plaintiffs' second claim is that Defendants violated the Parity Act by requiring D.R. present acute level symptoms before receiving benefits for RTC care while applying a lesser standard for analogous intermediate inpatient medical and surgical care.[256]  Under the Parity Act, plans providing "both medical and surgical benefits and mental health or substance use disorder benefits" may not contain or impose mental health treatment limitations that are "more restrictive than the predominant treatment limitations applied to substantially all medical and surgical

---

[254] *Id.* at 1316 (quoting *Carlile*, 988 F.3d at 1229).

[255] Since Defendants' ultimate determination in the level two appeal concluded D.R. could have received inpatient treatment at a qualified RTC, medical necessity was not a rationale raised for the denial.  Defendants may not consider it on remand.

[256] *Plaintiffs' MSJ* at 31–36.

benefits covered by the plan (or coverage)."[257]  Nor may the plan contain or impose "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits."[258]

Considering the court's reversal and remand of Plaintiffs' benefits claim, it would be improper to decide whether Defendants have violated the Parity Act because the claim is now moot.  Courts in this District have repeatedly declined to resolve Parity Act arguments "when a denial of benefits decision is either remanded or reversed."[259]  Under Article III of the Constitution, it exceeds the court's authority to decide potential controversies that rest upon "contingent future events that may not occur as anticipated, or indeed may not occur at all."[260] At this stage, the court does not know whether Defendants will deny coverage using the same guidelines and rationale, whether they continue to employ the same guidelines at issue in this case, or whether Plaintiffs will require RTC care in the future.  In view of the equitable relief that may be available for violations of the Parity Act and the uncertainty of Defendants' determinations on remand, "future disputes under the Parity Act are simply not ripe for decision."[261]

---

[257] 29 U.S.C. § 1185a(a)(3)(A).

[258] *Id.*

[259] *Theo M.*, 631 F. Supp. 3d at 1110; *see also Anne A. v. United Healthcare Ins. Co.*, No. 2:20-cv-00814-JNP-DAO, 2024 WL 1307168, at *9 (D. Utah Mar. 26, 2024) (declining to decide Parity Act claim because "[w]ith no basis to know whether Defendants will continue to deny coverage on remand or whether [plaintiff] will need RTC care in the future, the court finds this question premature"); *C.P. v. United Healthcare Ins. Co.*, 679 F. Supp. 3d 1184, 1186 (D. Utah 2023) (finding Parity Act claim "is mooted" by decision to remand arbitrary and capricious denial of benefits); *David P. v. United Healthcare Ins. Co.*, 564 F. Supp. 3d 1100, 1123 (D. Utah 2021) ("Because the court finds that reversal of UBH's benefits decision is appropriate on the basis that the determination was arbitrary and capricious, the court does not reach the issue of whether Defendants violated the Parity Act."), *aff'd in part, rev'd in part on other grounds*, 77 F. 4th 1293 (10th Cir. 2023).

[260] *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985).

[261] *Theo M.*, 631 F. Supp. 3d at 1111.

## C.  Claim for Statutory Penalties

Plaintiffs' third cause of action seeks an award of statutory penalties under

29 U.S.C. § 1132(c) for Defendants' failure to produce documents under which the Plan was

operated.[262]  This section "is the penalty provision applicable where the court finds a violation

of" 29 U.S.C. § 1024, one of ERISA's disclosure provisions.[263]  These sections "were included

in ERISA so that plan participants and beneficiaries would be in a position to make informed

decisions about how best to protect their rights."[264]

Section 1024(b)(4) requires plan administrators provide participants with a copy of

certain documents if the participant requests them in writing.[265]  The documents include "a copy

of the latest updated summary, plan description, and the latest annual report, any terminal report,

the bargaining agreement, trust agreement, contract, or other instruments under which the plan is

established or operated."[266]  "To establish a violation of this provision, a claimant must

demonstrate (1) the participant submitted a written request for information, (2) that information

is within the scope of 29 U.S.C. § 1024(b)(4), and (3) the administrator failed or refused to

provide the information within 30 days after the request."[267]

If the administrator fails to provide requested documents covered by the disclosure

provision within 30 days of the request, the plan administrator "may in the court's discretion be

personally liable to such participant or beneficiary in the amount of up to [$110] a day from the

---

[262] *Plaintiffs' MSJ* at 36.

[263] *Moothart v. Bell*, 21 F.3d 1499, 1503 (10th Cir. 1994).

[264] *Id.* (citation omitted).

[265] 29 U.S.C. § 1024(b)(4).

[266] *Id.*

[267] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1033 (D. Utah 2021) (citing 29 U.S.C. § 1132(c)(1)(B)).

date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."[268]

Plaintiffs contend a letter requesting covered Plan documents was delivered to Defendant Corning, the plan administrator, "on or about May 26, 2020."[269]  According to Plaintiffs, Defendants failed to respond within the required 30 days and are liable for statutory penalties.[270] Defendants counter that they do not have the letter and the purported "draft" Plaintiffs produced in litigation does not prove otherwise.[271]

Although Plaintiffs assert the letter was delivered to the plan administrator on May 26, 2020, resolution of this claim is complicated by the fact no party is in possession of the original letter.  Defendants contend they never received the letter and Plaintiffs no longer have a copy of the original.  Rather, Plaintiffs offer an unsigned and undated "draft" of the letter which the court previously permitted them to supplement the record with.[272]  To establish the authenticity of the letter, Plaintiffs' Motion for Summary Judgment includes a sworn affidavit averring that the draft represents a true and accurate copy of the letter sent.[273]  When Plaintiffs moved to supplement the record with the draft letter, they also included the U.S. Postal Service certified mail receipt

---

[268] 29 U.S.C. § 1132(c)(1)(B).  The statute initially set the maximum daily penalty at $100 per day but it has subsequently been raised to $110 per day.  *See* 29 C.F.R. § 2575.502c-1.

[269] *Id.* at 37.

[270] *Id.*

[271] *Defendants' MSJ* at 36–39.  Addressing several previous unanswered requests for Plan documents Plaintiffs submitted, Defendants also argue Plaintiffs' claim is time-barred because they filed this case outside a state law statute of limitations.  *Id.*  The court need not address this argument, or determine whether the Tenth Circuit applies state statutes of limitations to claims for statutory penalties under ERISA, because Plaintiffs only seek penalties for the May 2020 letter, which the parties do not dispute falls within the limitations period.

[272] *H.R. v. United Healthcare Ins. Co.*, No. 2:21-cv-00386-RJS-DBP, 2022 WL5246662, at *4 (D. Utah Oct. 6, 2022).

[273] Dkt. 71-1.

demonstrating the letter was delivered to the Corning Incorporated Benefits Committee and signed for by an individual at that location.[274]  Plaintiffs contend this sufficiently proves the plan administrator received Plaintiffs' written request for governing Plan documents and the administrator's failure to timely respond subjects it to statutory penalties.[275]

Defendants assert that, despite efforts to locate a copy of the letter, they are not in possession of it and the unsigned, undated draft letter "cannot constitute a 'true and correct' copy of a letter purportedly dated May 26, 2020."[276]  Further, though the court permitted Plaintiffs to supplement the administrative record with the draft letter, it did not order the certified mail receipt added to the record.[277]  Thus, Defendants contend, the receipt is not part of the record and cannot be considered on Plaintiffs' Motion for Summary Judgment.[278]  Moreover, according to Defendants, the draft letter and the certified mail receipt demonstrate Plaintiffs sent the request for documents to the wrong address.[279]  The address listed on the draft letter and the certified mail receipt is "MP-HQ-01-E24, One Riverfront Plaza, Corning, NY 14381."[280]  However, the address in effect in May 2020 for the plan administrator was "MP-HQ-01-E03, One Riverfront Plaza, Corning, NY 14831."[281]  Defendants argue that even if the court considers the draft letter

---

[274] Dkt. 34-4.

[275] *Plaintiffs' Opposition* at 37.

[276] *Defendants' MSJ* at 38–39.

[277] *Defendants' Opposition* at 38.

[278] *Id.* (citing *Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151, 1157 (10th Cir. 2010); *Allison v. UNUM Life Ins. Co. of Am.*, 381 F.3d 1015, 1021 (10th Cir. 2004)).

[279] *Id.*; *Defendants' MSJ* at 39.

[280] *Defendants' MSJ* at 29 (citing A.R. 10701).

[281] *Id.*

and certified mail receipt, this demonstrates the Plan Administrator did not receive the request and they are entitled to summary judgment on Plaintiffs' claim for statutory penalties.[282]

The court determines Plaintiffs have adequately demonstrated they submitted a written request to the Plan Administrator, seeking documents covered by § 1024(b)(4), and Defendants failed to provide the documents within 30 days.  When the court permitted Plaintiffs to supplement the record with the draft letter, it stated "challenges to the authenticity and weight given the draft version of the Letter are issues Defendants may raise when they brief the merits of the statutory penalties claim."[283]  Plaintiffs submitted a sworn affidavit attesting to the accuracy of the draft letter, stating it "is a true and correct copy of the letter that [they] caused to be sent to Corning via certified mail to [sic] in May of 2020."[284]  Defendants urge the court to reject this but provide no basis for doing so.  They do not argue or present evidence suggesting Plaintiffs' affidavit is not credible.  The court thus has no reason to believe the draft letter is not what Plaintiffs purport it to be—a true and correct copy of the letter sent to Defendants requesting Plan documents.

Furthermore, the court may consider the certified mail receipt demonstrating the letter was delivered to Corning, on May 26, 2020.  As the court previously discussed when granting Plaintiffs' motion to supplement the record, what extra-record evidence may be considered in an ERISA case is a nuanced question.[285]  Defendants argue the court may only consider what is in

---

[282] The parties only engage with the first element of the statutory penalties claim, whether Plaintiffs submitted a written request to the plan administrator, and do not dispute that the requested documents were within the scope of § 1024(b)(4) nor that the administrator failed to provide them within 30 days.

[283] *H.R.*, 2022 WL 5246662, at *4.

[284] *See* Dkt. 71-2.

[285] *See H.R.*, 2022 WL 5246662, at *3.

the administrative record when deciding Plaintiffs' claim for statutory penalties but the cases they cite do not support that unqualified proposition.

The Tenth Circuit has "cautioned against too broad of a reading of our precedent regarding supplementation of an ERISA administrative record."[286]  Extra-record supplementation is not permitted when considering a participant's eligibility for benefits on a denial of benefits claim.[287]  However, "this general restriction does not conclusively prohibit a district court from considering extra-record materials" when deciding other issues and claims under ERISA.[288]  In *Hall v. UNUM Life Insurance Company of America*, the Tenth Circuit provided a non-exhaustive list of "exceptional circumstances" which could warrant the admission of additional evidence.[289]  One such circumstance is where "there is additional evidence that the claimant could not have presented in the administrative process."[290]  The court may exercise its discretion to admit extra-record evidence "if the proponent can show it: (1) is necessary to an ERISA claim (so long as it is not concerning a benefit eligibility claim), (2) could not have been submitted to the administrator while evaluating benefits, and (3) would aid in a 'fair and informed resolution of the claim.'"[291]

The court is not certain it must conduct this analysis because the certified mail receipt was included as an exhibit when it previously decided Plaintiffs could supplement the record

---

[286] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1129 (10th Cir. 2011) (citing *Murphy*, 619 F.3d at 1157–59).

[287] *Murphy*, 619 F.3d at 1159.

[288] *Id.* at 1161–62 ("Specifically, the broad language prohibiting extra-record discovery is potentially misleading in cases involving a dual role conflict of interests or procedural irregularities.").

[289] 300 F.3d 1197, 1203 (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1027 (4th Cir. 1993)).

[290] *Id.*

[291] *H.R.*, 2022 WL 5246662, at * 3 (quoting *Murphy*, 619 F.3d at 1164).

with the draft letter.[292]  But in the interest of completeness, the court now ensures the criteria are met.  First, Plaintiffs have shown the certified mail receipt is necessary to its claim for statutory penalties.  Given Defendants' position that they are not in possession of the letter, the receipt is necessary to demonstrate the statutorily required written request for documents was delivered to Defendants.  And importantly, Plaintiffs' claim for statutory penalties does not concern its denial of benefits claim.

Second, the mail receipt could not have been submitted to the plan administrator while it was evaluating Plaintiffs' claim for benefits.  The letter was mailed on May 23, 2020, and delivered on May 26, 2020.  Defendants review of Plaintiffs' claim for benefits was completed, at the latest, on July 1, 2019, when Defendants issued the decision of the independent external reviewer.[293]  Thus, the circumstances pertaining to Plaintiffs' statutory penalties claim occurred after the plan administrator evaluated the claim for benefits.

Third, consideration of the certified mail receipt is necessary to a fair and informed resolution of Plaintiffs' statutory penalties claim.  Given the circumstances, this evidence is necessary to establish Plaintiffs did what ERISA requires them to do before seeking statutory penalties.  Defendants do not dispute the authenticity of the receipt and it establishes Plaintiffs' written request was delivered.  Accordingly, even if the court's previous order supplementing the record with the draft letter did not cover the certified mail receipt, the court concludes consideration of the document now is permissible and appropriate.

Lastly, the court finds Defendants' argument concerning the address error unpersuasive. Defendants highlight the draft letter and certified mail receipt demonstrate Plaintiffs submitted

---

[292] *See* Dkt. 34-4.

[293] *See Defendants' MSJ* at 14.

their request for documents to a mistaken internal routing code at the plan administrator's location.  However, Plaintiffs mailed the letter to the correct physical address and the internal routing code Plaintiffs designated in the address was the correct code at least as late as 2018—the operative year of the Plan under which Plaintiffs sought benefits.[294]  Consistent with Defendants' fiduciary obligation to Plaintiffs, it is not unreasonable to presume Defendants are a sophisticated corporate entity capable of ensuring correspondence makes it to the correct representative when it is mistakenly delivered to the wrong office.[295]

Accordingly, the court determines Plaintiffs have established they are entitled to statutory penalties for Defendants' failure to provide the requested Plan documents within 30 days. Having concluded Defendants violated their obligations under the relevant ERISA disclosure provision, the court next considers the appropriate formulation of the penalty.

Under § 1132(c)(1)(B) the imposition of penalties is subject to the discretion of the court.[296]  The penalty provision provides the court with a mechanism to punish past violations and deter future failures to abide by ERISA's disclosure requirements.[297]  "The focus is necessarily on the plan administrator's actions, not the participants."[298]  There are several non-dispositive factors the court may consider when deciding whether and how to exercise its discretion: "(1) the administrator's bad faith or intentional conduct; (2) the length of the delay;

---

[294] A.R. 186.

[295] The court recognizes the certified mail receipt is circumstantial evidence requiring the court make an inference that the letter was ultimately received by Defendants.  However, drawing the conclusion Defendants received the letter and failed to respond to the request for Plan documents requires only a small step as it is consistent with Defendants pattern in this case.  While Plaintiffs only seek statutory penalties for their 2020 request, Defendants acknowledge Plaintiffs also submitted requests for Plan documents in 2018 and 2019 that similarly went without a response.  *Defendants' MSJ* at 38.

[296] *See Boone v. Leavenworth Anesthesia, Inc.*, 20 F.3d 1108, 1111 (10th Cir. 1994).

[297] *See Dalton v. CHS/Cmty. Health Sys.*, No. 2:12-cv-0412-BSJ, 2014 WL 4257855, at *1 (D. Utah Aug. 14, 2014).

[298] *Moothart*, 21 F.3d at 1506–07.

(3) the number of requests made; (4) the extent and importance of the documents withheld; and (5) the existence of any prejudice to the participant or beneficiary."[299]  Though they may be taken into account, "neither prejudice nor injury are prerequisites to recovery under the penalty provisions of the statute."[300]

In this case, many of these factors overlap but all support imposing a meaningful penalty. That said, the court concludes, due to the minimal prejudice demonstrated by Plaintiffs, imposition of the maximum penalty is unwarranted.  The court need not determine Defendants acted in bad faith to conclude its conduct was at least intentional.  Although Plaintiffs seek penalties for only the May 2020 document request, as Defendants acknowledge, Plaintiffs requested Plan documents on numerous prior occasions,[301]  but each request went ignored.  For the request at issue here, the best explanation Defendants can offer for their conduct is a clerical technicality: the letter was delivered to an internal routing code that, though previously would have been correct, in 2020 was no longer accurate.  As evidenced, the letter was delivered to and received by one of Defendants' representatives.  As a sophisticated entity with fiduciary obligations to Plaintiffs, the apparent inability to ensure correspondence delivered to a previously correct office arrives at its intended destination demonstrates, in the most charitable light, something akin to willful blindness—an intentional failure to ensure the systems necessary to meet Defendants' obligations under ERISA were in place.

---

[299] *M.S.*, 553 F. Supp. 3d at 1037 (citation omitted).

[300] *Moothart*, 21 F.3d at 1506 (citation omitted).

[301] *See Defendants' MSJ* at 37–38 ("Plaintiffs requested documents from United in 2018 and 2019, with the latest such request being dated March 26, 2019.").

Further, the Plan documents Plaintiffs requested were important and Defendants' failure to provide them was at least somewhat prejudicial.[302]  Indeed, that is why ERSIA requires their disclosure.  The documents Plaintiffs requested, such as the Plan's governing documents and the standards of medical necessity, are essential to put Plaintiffs "in a position to make informed decisions about how best to protect their rights."[303]  When Defendants failed to comply with ERISA's disclosure requirements, they not only impeded Plaintiffs' ability to understand and protect their rights, they impeded ERISA's overarching purpose.[304]  As a consequence of this failure, over a year after their request went unanswered, Plaintiffs' only recourse was to file this suit.[305]  Even then, Plaintiffs still did not receive the requested documents until Defendants produced them in discovery another 15 months later.[306]

However, for the request underlying Plaintiffs' claim, this prejudice appears to have been minimal.  The request at issue was submitted to Defendants in May 2020, after the administrative claims process had concluded.  Accordingly, Plaintiffs' inability to obtain the Plan documents at that time could not have affected their capacity to make informed decisions about how best to protect their rights as they navigated the appeals of the adverse benefits determinations.  Furthermore, once Plaintiffs received the documents in discovery, they did not amend their claims or take other actions demonstrating possession of the documents materially altered their

---

[302] *See M.S.*, 553 F. Supp. 3d at 1040 (finding failure to disclose requested documents prejudiced plaintiffs "by interfering with their ability to understand and protect their rights under ERISA, and needlessly prolonging litigation").

[303] *See Moothart*, 21 F.3d at 1503.

[304] *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1250 (10th Cir. 2004) ("Congress designed ERISA 'to promote the interests of employees and their beneficiaries in employee benefit plans.'") (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990)).

[305] *Complaint*.

[306] *Plaintiffs' MSJ* at 37 (citing Dkt. 45).

calculus.  This suggests the prejudice to Plaintiffs from Defendants' failure to provide the
requested documents was minimal.  Under these circumstances, while a penalty is warranted,
imposition of the maximum allowable penalty would be inappropriate.

In sum, though the court only considers the May 2020 request in determining the
appropriate penalty, Plaintiffs repeatedly requested documents they were entitled to under
ERISA's disclosure provision.  Instead of simply providing the documents, Defendants ignored
each request, failing for years to provide the documents.  As a result, Plaintiffs were left without
information integral to understanding how best to protect their rights and were left to seek
vindication of those rights through protracted litigation.  Exercising its discretion, the court
concludes imposition of a substantial statutory penalty is necessary to punish Defendants for
their disregard of ERISA's disclosure provision and, hopefully, encourage future compliance.
However, due to the minimal prejudice to Plaintiffs, the court imposes a penalty of $95 per day,
rather than the maximum penalty of $110 per day.

Plaintiffs' request was delivered on May 26, 2020.  Defendants did not provide the
documents until they were produced in discovery for this litigation on September 26, 2022.[307]
Subtracting the 30 days the Plan Administrator had to produce the documents, Corning is liable
for a statutory penalty of $95 per day for 824 days.  Plaintiffs' Motion for Summary Judgment on
its claim for statutory penalties is granted and Defendants' Motion is denied.  The court imposes
statutory penalties against Corning, payable to Plaintiffs, in the amount of $78,280.00.

### D. Attorney Fees and Costs

If the court finds in their favor on summary judgment, Plaintiffs assert they are entitled to
an award of pre- and post-judgment interest, attorney fees, and costs pursuant to

---

[307] *Plaintiffs' MSJ* at 37 (citing Dkt. 45).

29 U.S.C. § 1132(g).[308]  Defendants dispute that,[309] and both sides request an opportunity to file supplemental briefing on the matter.[310]  Having determined remand is appropriate on Plaintiffs' denial of benefits claim, the court concludes resolution of the attorney fee issue is premature at this stage.

The Tenth Circuit recently held when a benefits denial is reversed and remanded for reconsideration, it is not appropriate to consider a request for attorney fees prior to that reconsideration.[311]  The court acknowledges Plaintiffs have achieved some degree of success on the merits and may satisfy at least some of the factors the court considers when determining whether an award of attorney fees in an ERISA action is warranted.[312]  However, given the uncertain outcome of Defendants' reconsideration of Plaintiffs' claim for benefits the attorney fees issue is not ripe for decision.

Accordingly, the court will retain jurisdiction over the case to reconsider Plaintiffs' entitlement to attorney fees following Defendants' proper reconsideration of Plaintiffs' benefits claim.[313]

---

[308] *Plaintiffs' MSJ* at 39–40.

[309] *Defendants' MSJ* at 39.

[310] *Plaintiffs' MSJ* at 40; *Defendants' Opposition* at 39.

[311] *David P.*, 77 F.4th at 1316 (reversing and remanding district court's award of attorney fees for "reconsideration after UBH properly reconsiders Plaintiffs' benefits claims").  *See also Graham v. Hartford Life and Accident Ins. Co.*, 501 F.3d 1153, 1162 (10th Cir. 2007) (holding "a decision regarding attorney's fees is premature" when a claim for benefits is remanded until after plan administrators make a new determination of plaintiff's eligibility for benefits).

[312] *See Gordon v. U.S. Steel Corp.*, 724 F.2d 106, 109 (10th Cir. 1983).

[313] *See David P.*, 77 F.4th at 1316 ("One way the district court might choose to effectuate its reconsideration of the attorney's fee issue would be to retain jurisdiction over this case even as it remands Plaintiffs' benefits claims to UBH for its proper reconsideration.").

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Summary Judgment is GRANTED in part and DENIED in part.[314]  Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.[315]  The court REVERSES Defendants' denial of benefits for Plaintiffs' treatment at Second Nature and Maple Lake, and REMANDS to Defendants for proper reconsideration.  In view of that remand, Plaintiffs' second cause of action under the Parity Act is DENIED as moot.  The court GRANTS Plaintiffs' third cause of action for statutory penalties and ORDERS the Plan Administrator pay Plaintiffs a penalty in the amount of $78,280.00.  The court retains jurisdiction to consider Plaintiffs' request for pre- and post-judgment interest, attorney fees, and costs following Defendants' reconsideration of Plaintiffs' benefits claim on remand.

The Clerk of Court is directed to close the case, subject to the court's retention of jurisdiction over fee-related issues or a motion to reopen for good cause shown.

So ordered this 24th day of June 2024.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[314] Dkt. 71; Dkt. 72.

[315] Dkt. 69.